**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| CTM HOLDINGS, LLC, an Iowa limited liability company,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>THE UNITED STATES DEPARTMENT OF AGRICULTURE; THOMAS J. VILSACK, in his official capacity as the Secretary of the United States Department of Agriculture; THE NATURAL RESOURCES CONSERVATION SERVICE; TERRY COSBY, in his official capacity as Chief of the Natural Resources Conservation Service; and JON HUBBERT, in his official capacity as Iowa State Conservationist,<br><br>　　　　Defendants. | No. 24-CV-02016-CJW-MAR<br><br>**MEMORANDUM IN SUPPORT OF SUSTAINABLE AGRICULTURE GROUPS' MOTION TO INTERVENE AS DEFENDANTS UNDER FEDERAL RULE OF CIVIL PROCEDURE 24** |

## TABLE OF CONTENTS

I.　INTRODUCTION ................................................................................................ 4

II.　BACKGROUND ................................................................................................. 5

　A.　History of Swampbuster and Sodbuster ..................................................... 5

　B.　Sustainable Agriculture Groups ................................................................. 6

III.　ARGUMENT ..................................................................................................... 7

　A.　Legal Standard ............................................................................................ 7

　B.　Proposed Intervenors have standing. .......................................................... 8

　　1.　Proposed Intervenors meet the organizational components of standing. ......... 8

　　2.　Proposed Intervenors' members risk being injured by Plaintiff's lawsuit. ........ 9

　　　a.　This lawsuit threatens Proposed Intervenors' members' economic interests. ........... 10

　　　b.　This lawsuit threatens Proposed Intervenors' members' health. ............................ 13

    c.   This lawsuit threatens Proposed Intervenors' members' aesthetic and recreational interests. .................................................................................................................... 14

   3.   Plaintiff's requested relief would injure Proposed Intervenors' members, and a favorable ruling from this Court would prevent that injury. ........................... 15

C.   Proposed Intervenors are entitled to intervention as of right. ........................................... 16

   1.   Proposed Intervenors' motion is timely. .......................................................... 16

   2.   Proposed Intervenors' recognized interest in their members' continued ability to farm sustainably may be impaired by the outcome of this case. ............................... 16

   3.   Defendants do not adequately represent Proposed Intervenors' interests. .................... 18

    a.   The *parens patriae* presumption does not apply because Proposed Intervenors' interests are narrow and parochial. .................................................. 18

    b.   The *parens patriae* presumption does not apply because the Defendants could change their position. .................................................................................... 20

D.   Alternatively, the Court Should Grant Permissive Intervention ....................................... 22

IV.  CONCLUSION ................................................................................................................ 22

# Table of Authorities

**Cases**

*ACLU Minn. v. Tarek ibn Ziyad Academy*, 643 F.3d 1088, 1092 (8th Cir. 2011) .................... 9, 15

*Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179, 211 n.4 (2022) ........................ 22

*Enter. Fin. Grp., Inc. v. Podhorn*, 930 F.3d 946, 950 (8th Cir. 2019) ............................................ 9

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183–184 (2000).... 9

*Grand Portage Band of Lake Superior Chippewa v. U.S. EPA*, No. 22-cv-1783, 2022 WL
20305844, at *3–5 (D. Minn. Nov. 21, 2022)................................................................................. 9, 15

*Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005) ............................... 9

*Horn Farms, Inc. v. Johanns*, 397 F.3d 472, 476–77 (7th Cir. 2005) .......................................... 16

*Mausolf v. Babbitt*, 85 F.3d 1295, 1303 (8th Cir. 1996).................................................. 18, 19, 21

*Mille Lacs Band of Chippewa Indians v. State of Minnesota*, 989 F.2d 994, (8th Cir. 1993) passim

*Nat'l Parks Conservation Ass'n v. U.S. EPA*, 759 F.3d 969, 974 (8th Cir. 2014)................. passim

*North Dakota Farm Bureau, Inc. v. Stenehjem*, No. 16-cv-137, 2017 WL 11679215, at *4
(D.N.D. Jan. 11, 2017) ............................................................................................... 19, 20, 21

*Sierra Club v. United States Army Corps of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011)........ 7, 8, 9

*South Dakota ex rel Barnett v. U.S. Dep't. of Interior*, 317 F.3d 783, 785 (8th Cir. 2003) .... 16, 22

*South Dakota Farm Bureau, Inc. v. South Dakota*, 189 F.R.D. 560, 564–65 (D.S.D. 1999)........ 17

*South Dakota v. Ubbelohde*, 330 F.3d 1014, 1024–25 (8th Cir. 2003)........................................... 9

*United States v. Dierckman*, 201 F.3d 915, 922 (7th Cir. 2000) ................................................. 16

*United States v. Union Elec. Co.*, 64 F.3d 1152, 1159 (8th Cir. 1995)............................. 16, 17, 18

**Statutes**

16 U.S.C. § 3831 ........................................................................................................................... 3

16 U.S.C. § 3801 ...................................................................................................................... 1, 2

16 U.S.C. § 3811-14 ................................................................................................................. 1, 2

16 U.S.C. § 3821-24 ................................................................................................................. 1, 2

**Rules**

Fed. R. Civ. P. 24 ............................................................................................................. 7, 8, 17, 22

L.R. 7.0 ...................................................................................................................................... 18

L.R. 7.1 ...................................................................................................................................... 19

**Other Authorities**

1985 U.S.C.C.A.N. 1103, 1188, 1985 WL 47145........................................................................ 2

H.R. Rep. No. 99-271, pt. 1, at 86–87 (1985) ................................................................... 2, 11, 16

## I.    **INTRODUCTION**

CTM Holdings, a single-member LLC that "owns farmland" in Iowa (Complaint ("Compl.") ¶ 36), seeks to end "Swampbuster,"[1] a voluntary wetlands conservation program that Congress authorized decades ago, and that the U.S. Department of Agriculture ("USDA") has administered ever since. This lawsuit would also effectively terminate "Sodbuster,"[2] a related voluntary conservation program that protects against soil erosion and operates identically to Swampbuster. The loss of these long-standing conservation programs would cause significant environmental damage including increased flooding, degraded water quality, and widespread habitat loss,[3] which would, in turn, lead to significant economic, human health, and recreational harms for America's farmers.

Iowa Farmers Union, Dakota Rural Action, Food & Water Watch, and Iowa Environmental Council (collectively, "Sustainable Agriculture Groups" or "Proposed Intervenors") are organizations that advocate for sustainable farming and natural resource conservation. Eliminating or weakening Swampbuster and Sodbuster would directly threaten their members, families, and communities by exposing them to increased risk of flooding, contaminated drinking water, reduced property values, loss of farm income, and reduced access to USDA benefits. As explained below, the Sustainable Agriculture Groups meet the legal requirements for intervention and respectfully ask to be heard.

---

[1] 16 U.S.C. §§ 3801, 3821–24.

[2] 16 U.S.C. §§ 3801, 3811–14.

[3] *See* M.W. Lang, et al., *Status and Trends of Wetlands in the Conterminous United States 2009 to 2019*, U.S. Dep't of The Interior; Fish and Wildlife Service (Mar. 2024), https://www.fws.gov/sites/default/files/documents/2024-04/wetlands-status-and-trends-report-2009-to-2019_0.pdf (hereinafter "Trends of Wetlands").

## II.     BACKGROUND

### A.     History of Swampbuster and Sodbuster

The 1985 Farm Bill included two provisions, often referred to as "Swampbuster" and "Sodbuster," aimed at reducing environmental harms caused by increased federal-subsidies for agricultural production. *See* 16 U.S.C. §§ 3801, 3811–14, 3821–24. Swampbuster conditions receipt of federal economic benefits (e.g. crop insurance) on not draining identified wetlands for agricultural production, and Sodbuster conditions those benefits on not farming on highly erodible lands. In 1985, Congress called wetlands "a priceless resource" and declared the loss of more than 50 percent of the nation's wetlands "environmentally unacceptable." H.R. REP. NO. 99-271, pt. 1, at 86–87 (1985), *reprinted in* 1985 U.S.C.C.A.N. 1103, 1188, 1985 WL 47145. Congress emphasized that "there is certainly no need for the conversion of more resources into agricultural production especially when those wetland resources have such inherent value and provide such practical benefits." *Id.* Those words remain true today.

Swampbuster has successfully reduced the rate of wetlands being lost to agriculture. According to the U.S. Fish and Wildlife Service, wetland loss in the mid-twentieth century "was dominated" by agricultural drainage and filling.[4] But in the decade following the establishment of the Swampbuster program (1986–1997), agricultural loss dropped to 26 percent, with urban and rural development replacing agriculture as the primary loss driver (53 percent).[5]

The Complaint incorrectly characterizes Swampbuster as "compulsory" (Compl. ¶ 16), but neither Swampbuster nor Sodbuster are mandatory. Instead, the programs "simply deny the benefits of [federally subsidized] farm programs to those who engage in [the] unwise practices" of filling wetlands and/or farming highly erodible land. H.R. REP. NO. 99-271, at 88. The programs

---

[4] Trends of Wetlands, *supra*, n.3, at 24.
[5] *Id.*

operate identically: if a farmer engages in "swampbusting" or "sodbusting," the farmer is ineligible for certain federal benefits. *See* 16 U.S.C. § 3811 (program ineligibility under Sodbuster) *and* 16 U.S.C. § 3821 (program ineligibility under Swampbuster).[6] As a result, if the Court found Swampbuster unconstitutional, Sodbuster would be unconstitutional as well.

## B.     Sustainable Agriculture Groups

**Iowa Farmers Union**. Since 1915, Iowa Farmers Union ("IFU") members have worked together to strengthen the independent family farm through education, legislation, and cooperation and to provide Iowans with sustainable production, safe food, a clean environment and healthy communities.  IFU is a grassroots member organization of family farmers and ranchers, advocates, and consumers committed to promoting family agriculture and a healthy landscape. Lehman Decl. ¶¶ 3–5.

**Dakota Rural Action**. Dakota Rural Action ("DRA") organizes people and builds leadership while developing strong allied relationships. DRA protects environmental resources, advocates for resilient agriculture systems, and empowers people to create policy change that strengthens their communities and cultures. DRA envisions an active and engaged membership promoting healthy, beautiful, and just food, agriculture, and energy systems that protect clean air, water, and soil for all the current and future inhabitants of South Dakota. James Decl. ¶¶ 4-7.

---

[6] Plaintiff asserts that Swampbuster is different because "Sodbuster . . . pays farmers market rent to keep their 'highly erodible land' acreage in conservation," while Swampbuster includes "no payment of rent to the farmer." (Compl. ¶¶ 17, 16.). Plaintiff is confused. Neither the Sodbuster program nor the Swampbuster program "pay farmers market rent." (*Id.*) There is, however, a separate program—also established by the 1985 Farm Bill—referred to as the Conservation Reserve Program ("CRP"), which pays money to farmers who implement certain conservation practices on highly erodible lands. *See* 16 U.S. Code § 3831. A related program called the Wetlands Reserve Program pays money for wetland protection practices. *See Wetlands Reserve Program* Fact Sheet, NATURAL RESOURCES CONSERVATION SERVICE (Sept. 2004), https://www.nrcs.usda.gov/sites/default/files/2022-12/WRPFct.pdf. Numerous other federal programs, including some administered by the U.S. Fish & Wildlife Service, also pay farmers to protect and maintain their wetlands. *See Wetland Easements*, U.S. FISH & WILDLIFE SERVICE, https://www.fws.gov/service/wetland-easements (last visited Oct. 1, 2024).

**Food & Water Watch**. Food & Water Watch is a is a national, nonprofit membership organization that mobilizes regular people to build political power to move bold and uncompromised solutions to the most pressing food, water, and climate problems of our time. With more than 2 million supporters, Food & Water Watch fights for sustainable food, clean water, and a livable climate for all of us. Jones Decl. ¶¶ 4–6.

**Iowa Environmental Council**. The Iowa Environmental Council is a nonprofit environmental coalition working to create a safe, healthy environment and sustainable future for all Iowans. The organization works on federal, state, and local policy issues to protect water quality including adoption of agricultural conservation practice. Green Decl. ¶¶ 3-5.

### III.   ARGUMENT

### A.   Legal Standard

To participate in a lawsuit filed in the Eighth Circuit, intervenors must establish Article III standing in addition to meeting the requirements of Federal Rule of Civil Procedure 24. *Nat'l Parks Conservation Ass'n v. U.S. EPA*, 759 F.3d 969, 974 (8th Cir. 2014). Associational parties seeking to intervene on behalf of their members demonstrate standing by establishing "(1) the organization's individual members would have standing to sue in their own right; (2) the organization's purpose relates to the interests being vindicated; and (3) the claims asserted do not require the participation of individual members." *Sierra Club v. United States Army Corps of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011). An individual establishes standing to sue by alleging facts satisfying three elements: (1) the party has suffered or is at imminent risk of suffering an injury to some concrete, particularized, and legally protected interest; (2) there is a "causal connection between the injury and the conduct complained of"; and (3) the injury is redressable by a favorable decision in the case. *Nat'l Parks Cons Ass'n*, 759 F.3d at 974–75.

Intervention as of right is proper if (1) the motion is timely; (2) the would-be intervenor has a recognized interest in the subject matter of the litigation; (3) that interest would be impaired by an adverse ruling; and (4) the existing parties to the litigation will not adequately protect that interest. FED. R. CIV. P. 24(a)(2). Alternatively, a party may receive permissive intervention by filing a timely motion demonstrating a shared claim or defense with the main action. FED. R. CIV. P. 24(b)(1)(B).

Courts reviewing a motion to intervene accept all material allegations as true and construe the motion in favor of prospective intervenors. *Nat'l Parks Cons Ass'n*, 759 F.3d at 973. Further, courts assume that the plaintiff will prevail and secure the remedy it seeks. *Id.* As explained below, Sustainable Agriculture Groups have Article III standing and meet the test for intervention of right. Alternatively, permissive intervention is warranted.

**B.** **Proposed Intervenors have standing.**

**1.** **Proposed Intervenors meet the organizational components of standing.**

Sustainable Agriculture Groups meet the three-part associational standing test. First, as demonstrated in Sections III.B.2 and III.B.3 below and as supported by their declarations, each declarant would have standing to sue in their own right. *See Sierra Club*, 645 F.3d at 986. Second, the "interests being vindicated" in this lawsuit, *id.*, relate directly to Proposed Intervenors' organizational purposes, which include promoting sustainable agriculture and protecting the environment. *See supra* Section II.B. Finally, the participation of individual members is not required because Proposed Intervenors seek only to defeat Plaintiff's claims for declaratory and injunctive relief, and do not seek monetary damages or other individualized relief. *See* **Exhibit A** (Sustainable Agriculture Groups' Answer) ¶ 3; *see also Heartland Acad. Cmty. Church v. Waddle*,

427 F.3d 525, 533 (8th Cir. 2005) (participation of individual members is not required if only declaratory and injunctive relief are sought).

### 2. Proposed Intervenors' members risk being injured by Plaintiff's lawsuit.

To have standing, a party must suffer an "injury in fact," meaning "an invasion of a 'legally cognizable right' [] that is 'concrete, particularized, and either actual or imminent.'" *ACLU Minn. v. Tarek ibn Ziyad Academy*, 643 F.3d 1088 (8th Cir. 2011). As the Supreme Court recognized, "reasonable concerns about the effects of [pollution] on [a person's] recreational, aesthetic, and economic interests" meet that test. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183–184 (2000); *see also, e.g.*, *Enter. Fin. Grp., Inc. v. Podhorn*, 930 F.3d 946, 950 (8th Cir. 2019) ("alleged economic harm" established standing); *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1024–25 (8th Cir. 2003) (interest in preventing potential injury to downstream fisheries established standing); *Sierra Club*, 645 F.3d at 987–88 (threat to one member's "aesthetic enjoyment" established standing). Courts also recognize that if the harm would result from an adverse litigation outcome, it is sufficiently "actual or imminent" to satisfy Article III. *See, e.g.*, *Grand Portage Band of Lake Superior Chippewa v. U.S. EPA*, No. 22-cv-1783, 2022 WL 20305844, at *3–5 (D. Minn. Nov. 21, 2022) (potential "[e]conomic and environmental benefit losses" associated with litigation outcome established standing).

Proposed Intervenors' members are facing concrete, particularized, and imminent injuries here. As explained below, ending the Swampbuster and Sodbuster programs would impact virtually every aspect of these members' lives, threatening their economic and physical well-being and harming their aesthetic and recreational interests.

9

### a. This lawsuit threatens Proposed Intervenors' members' economic interests.

Sustainable Agriculture Groups' member declarants have been farming for generations. Lehman Decl. ¶ 9; S. Watkins Decl. ¶ 1; Gilbert Decl. ¶ 3; Nemec Decl. ¶¶ 4–6. Many of these members have developed a reciprocal relationship with the land they farm, laboring in exchange for nutritious crops and healthy livestock. Declarants have been using sustainable and regenerative farming practices on their own farms for decades. T. Watkins Decl. ¶ 6; Nemec Decl. ¶ 16; Lehman Decl. ¶¶ 12–15; Gilbert Decl. ¶¶ 10–11. Among the lessons declarants have learned is that not all land is meant for growing crops. T. Watkins Decl. ¶ 16; Nemec Decl. ¶ 8; Gilbert Decl. ¶ 13; Lehman Decl. ¶¶ 16, 18. They worry that, if this lawsuit prevails, other farmers will ignore that reality and put more land into production, compromising the healthy landscapes they have dedicated their lives to cultivating, and on which their livelihoods depend. S. Watkins Decl. ¶ 10; Nemec Decl. ¶¶ 11, 14–15; Gilbert Decl. ¶ 24; Lehman Decl. ¶¶ 33; T. Watkins Decl. ¶ 16. Indeed, IFU declarant John Gilbert believes that "Swampbuster is the last thumb in the dike preventing total destruction of our natural ecosystems." Gilbert Decl. ¶ 25. Without Swampbuster and Sodbuster, Proposed Intervenors' declarants expect:

**More floods**. Wetlands mitigate flood risk.[7] According to IFU member John Gilbert, his upstream neighbors have drained many of their wetlands over the years, which has meant "more flooding for us because there is less land capable of holding water upstream." Gilbert Decl. ¶ 7. In Iowa, this year's flood season was particularly devastating.[8] *See* Gilbert Decl. ¶ 8 (spring flood led to loss of 15 acres of corn and delay in planting soybeans). Without Swampbuster's protections,

---

[7] Trends of Wetlands, *supra*, n.3, at 6, 9–10, 24–25; *Wetlands: Protecting Life and Property from Flooding*, U.S. EPA (May 2006), https://www.epa.gov/sites/default/files/2016-02/documents/flooding.pdf.

[8] Tyne Morgan, *Flooding Across the Midwest May Have Wiped Out Up to 1 Million Acres of Crops, New Estimates Now Show*, AG WEB (July 3, 2024), https://www.agweb.com/news/crops/crop-production/flooding-across-midwest-may-have-wiped-out-1-million-acres-crops-new.

downstream flooding impacts are likely to become more severe, which could impact yields and increase production costs. *See* Lehman Decl. ¶ 29 ("If floods continue to increase, yields will be impacted, farm earnings will go down, and costs – including the costs of reseeding and additional fertilizer – will go up."); Gilbert Decl. ¶¶ 7–8; Nemec Decl. ¶ 14 (fields and pastures experience flooding, jeopardizing productivity of farmland and safety of cattle).

**Higher drinking water costs.** Wetlands protected by Swampbuster trap excess nutrients and reduce the transfer of agricultural pollutants like nitrates,[9] and Sodbuster's erosion-reducing measures provide similar ecosystem services. Unfortunately, contaminated drinking water is still all too common in rural Iowa,[10] and that has economic implications. According to a report by the Union of Concerned Scientists, the cost of removing nitrates from rural drinking water supplies could be as high as $4,960 per person per year.[11] Indeed, DRA declarant Nick Nemec does not drain his wetlands in part because it "sav[es him] money in the long run by ensuring [he has] a safe, reliable source of drinking water." Nemec Decl. ¶ 11; *see also* Lehman Decl. ¶¶ 27–28 (IFU members face financial issues due to rural drinking water supply). If Swampbuster and Sodbuster are invalidated, water quality will worsen and those costs are likely to go up.

**Lower crop earnings**. If Swampbuster and Sodbuster are invalidated, some farmers will choose to convert previously protected acreage into agricultural production. As a result, Proposed Intervenors' members fear that more acreage would be farmed overall, leading to a surplus of low-priced, hard-to-offload agricultural commodities. Nemec Decl. ¶¶ 8–10; Lehman Decl. ¶ 30;

---

[9] Trends of Wetlands, *supra* n.3, at 26.
[10] Iowa State's Jamie Benning says that "[n]itrate infiltration into water sources **is simply a part of Iowa's agricultural ecosystem**, and while many efforts are being made to control loss of agricultural nitrate to waterways, there is a risk of elevated nitrate in private wells." *See* Ann Statudt, *Rural Drinking Water Survey Shows Significant Nitrate Risk for Many Iowans*, IOWA STATE UNIVERSITY: EXTENSION AND OUTREACH (August 18, 2022, 1:56 PM), https://www.extension.iastate.edu/news/rural-drinking-water-survey-shows-significant-nitrate-risk-many-iowans, (emphasis added).
[11] Rebecca Boehm, *Dirty Water, Degraded Soil*, UNION OF CONCERNED SCIENTISTS (Jan. 14, 2021), https://www.ucsusa.org/resources/dirty-water-degraded-soil.

Gilbert Decl. ¶ 24. This would disproportionately impact smaller farmers like Proposed Intervenors' declarants who are "most vulnerable to economic hardship from fluctuating prices." Nemec Decl. ¶ 8. DRA declarant Nick Nemec worries that, "[i]n a world without Swampbuster and Sodbuster, [] large farming operations that can withstand price fluctuations will continue to expand to the detriment of small farmers and those hoping to start." *Id.* ¶ 10; *see also* S. Watkins Decl. ¶ 12 ("improving compliance with Swampbuster and Sodbuster would help stabilize farm income"); James Decl. ¶ 13 (losing Swampbuster would "create a lopsided situation where the few are permitted to benefit on the backs of the many").

**Reduced access to federal benefits**. Eliminating Swampbuster and Sodbuster could also reduce Proposed Intervenors' members' access to federal benefits. Plaintiff wants farmers to be granted unconditional access to USDA benefits, regardless of compliance with conservation programs. If this were allowed, the pool of applicants competing for already-oversubscribed federal aid opportunities would increase, making it likely that more farmers, including Proposed Intervenors' members, would be denied access to conservation funding. *See* James Decl. ¶ 9. According to a recent study, roughly half of valid applications for conservation funding are already being denied due to lack of funding.[12] That percentage is likely to go up in a post-Swampbuster/Sodbuster world.

**Lower property values**. The water quality benefits provided by wetlands also bolster property values,[13] while poor water quality decreases property values. Lehman Decl. ¶ 31; Nemec

---

[12] According to a recent study, between 2017-2022, NRCS received an overage of 73,730 "valid" applications per year, but denied roughly half of those (49%) "because the funds are not available." *See* J. Coppess, *Farm Bill 2023: NRCS Backlogs and the Conservation Bardo*, FARMDOC DAILY, DEPARTMENT OF AGRICULTURAL AND CONSUMER ECONOMICS, UNIVERSITY OF ILLINOIS AT URBANA-CHAMPAIGN, at 3 (Sept. 28, 2023), https://farmdocdaily.illinois.edu/wp-content/uploads/2023/09/fdd092823.pdf
[13] Saleh Mamun et al., *Valuing Water Quality in the United States Using a National Database on Property Values*, PROCS. OF THE NAT'L ACADEMY OF SCIENCES 4 (February 17, 2023), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10104588/pdf/pnas.202210417.pdf; *Healthy Lakes & Higher*

Decl. ¶ 11; James Decl. ¶ 11. Without the pollution mitigation benefits of Swampbuster and Sodbuster compliance, water quality in Proposed Intervenors' members' communities is likely to worsen and bring down the value of their land.

**Reputational harm**. If Swampbuster and Sodbuster compliance is no longer required, Proposed Intervenor IFU is concerned that the public's perception of farmers could "drop[]," as farmers would be seen as "opponents of commonsense environmental protection" who feel "entitled to taxpayer money without having to do anything to fulfill their end of the social bargain." Lehman Decl. ¶ 32. This could lead to an erosion of public support for federal aid to farmers, which would negatively impact IFU's members. *Id.*

### b. This lawsuit threatens Proposed Intervenors' members' health.

As noted above, the Sustainable Agriculture Groups' member declarants live in rural areas, many of which already deal with elevated levels of drinking water contaminants including nitrates. Gilbert Decl. ¶¶ 21–22 (nitrate levels exceeding safe drinking water levels); Lehman Decl. ¶ 28 (IFU members have wells that are not safe to drink from). In addition to making drinking water more expensive, these agricultural contaminants are correlated with higher rates of cancer, birth defects, and other negative health impacts. Gilbert Decl. ¶¶ 20–22; Lehman Decl. ¶ 28 (IFU members face health issues related to drinking water supply); S. Green Decl. ¶ 16 (IEC issued report on the health effects of nitrate contamination). Nineteen-year-old Food & Water Watch declarant Tatum Watkins was born premature with an abdominal wall defect and a neural tube defect, conditions linked to atrazine, an agricultural contaminant. T. Watkins Decl. ¶¶ 11–13. These conditions are classified as rare, though she knows two other people who have the same condition, both of whom also grew up on farms like she did. *Id.*

---

*Property Values*, U.S. EPA, https://www.epa.gov/sites/default/files/2015-10/documents/healthy_lakes_and_higher_property_values.pdf (last visited Oct. 1, 2024).

Declarants worry that more pollution could lead to rising numbers of cancers and birth defects. T. Watkins Decl. ¶¶ 11–13, 20, 23 (also noting that Iowa has "the fastest growing cancer rates in the country"). If more wetland acreage is used for agricultural production, fertilizer and pesticide use will increase, which, in turn, will mean more drinking water contamination. Increased loss of wetlands—which are known to filter contaminants—will further degrade drinking water and endanger rural residents like Proposed Intervenors' member declarants. *See* Gilbert Decl. ¶ 10 ("standing water de-nitrifies faster than moving water").

### c. This lawsuit threatens Proposed Intervenors' members' aesthetic and recreational interests.

In addition to mitigating floods, wetlands provide numerous other valuable environmental benefits, including wildlife habitat, water purification, groundwater recharge, and recreation.[14] Declarants currently enjoy the serenity and recreational opportunities offered by the rural environments in which they live. T. Watkins Decl. ¶¶ 9–10, 14–15, 26 (kayaking, observing wildlife and wildflowers); Nemec Decl. ¶ 15 (observing birds, insects and wildflowers); Lehman Decl. ¶ 7 (hiking, cycling, camping, and canoeing). This lawsuit threatens those opportunities.

For example, IFU declarant Aaron Lehman has a wetland on his property planted with native grasses, which he credits with reducing nutrient pollution, improving water quality, and increasing pollination in his surrounding farm areas. Lehman Decl. ¶ 17. These grasses provide critical wildlife habitat, in addition to the added economic benefit of higher yields. *Id*. IFU declarant John Gilbert also maintains a wetland on his property, which not only benefits him and his neighbors "in terms of reduced flooding and better water quality," but also provides a habitat

---

[14] *See, e.g.*, *Why Are Wetlands Important?*, U.S. EPA (March 11, 2024), https://www.epa.gov/wetlands/why-are-wetlands-important; Trends of Wetlands, *supra* n.3, at 6, 9–10, 24–31; *see also* H.R. REP. NO. 99-271, at 86–87 (recognizing that wetlands are invaluable sources of wildlife habitat, flood control, water purification, groundwater recharge, and recreation).

for a "plethora" of waterfowl, amphibians, insects, and mammals. Gilbert Decl. ¶ 12. The same is true for DRA declarant Nick Nemec, whose wetlands "provide critical habitat for many species of birds and other wildlife." Nemec Decl. ¶ 15.

In sum, the relief sought in this litigation would result in wetland and highly erodible land conversions that injure Proposed Intervenors' members' economic, health, recreational, and aesthetic interests. Injuries of this kind are concrete, particularized, and imminent, and therefore support Proposed Intervenors' standing to intervene.

### 3. Plaintiff's requested relief would injure Proposed Intervenors' members, and a favorable ruling from this Court would prevent that injury.

Sustainable Agriculture Groups' members also satisfy the second and third elements of individual standing because their injuries hinge on the outcome of the instant litigation. Parties seeking intervention can satisfy the second element—traceability—"when the defendant will be compelled to cause the alleged injury to the intervenor if the plaintiff prevails." *ACLU Minn.*, 643 F.3d at 1093; *see also, e.g.*, *Grand Portage Band*, 2022 WL 20305844, at *4–5 (citing *ACLU Minn.*, 643 F.3d at 1093) (element satisfied because intervenors can "trace [their] members' injuries to . . . a potential order from this Court"). As shown above, Proposed Intervenors will suffer myriad harms if Plaintiff prevails and USDA is forced to stop requiring compliance with Swampbuster and Sodbuster. As a result, the traceability requirement is satisfied. *Id.*

Potential Intervenors can satisfy the third standing element—redressability—if a favorable court order would prevent the injury threatened by an adverse ruling. *ACLU Minn.*, 643 F.3d at 1093; *see also Nat'l Parks Cons Ass'n*, 759 F.3d at 979. That is exactly the case here. An order of this Court declaring Swampbuster's structure constitutional (as multiple courts have already

done)[15] would prevent injury to Proposed Intervenors' members, which means those injuries are redressable in this case.

**C.    Proposed Intervenors are entitled to intervention as of right.**

The Sustainable Agriculture Groups satisfy the test for intervention as of right because (1) their motion is timely, (2) they have a recognized interest that could be impaired by the outcome of the litigation, and (3) existing parties to the litigation will not adequately protect their interests. *South Dakota ex rel Barnett v. U.S. Dep't. of Interior*, 317 F.3d 783, 785 (8th Cir. 2003).

**1.    Proposed Intervenors' motion is timely.**

When analyzing timeliness, courts consider "all the circumstances of the case," focusing on three factors: (1) the reason for any delay in moving to intervene; (2) how far the litigation has progressed; and (3) whether existing parties would be prejudiced by any delay. *United States v. Union Elec. Co.*, 64 F.3d 1152, 1159 (8th Cir. 1995). Here, the Court entered an order setting an October 31, 2024 deadline for "motions to add third parties." Dkt. No. 21. This motion is being filed on October 2, 2024. Accordingly, there has been no delay and this motion is timely.

**2.    Proposed Intervenors' recognized interest in their members' continued ability to farm sustainably may be impaired by the outcome of this case.**

The Sustainable Agriculture Groups also meet the second and third requirements for intervention as of right because they have a recognized interest in the subject matter of this litigation, and that interest may be impaired by the resolution of this case. To satisfy FED. R. CIV.

---

[15] *See, e.g.*, *Horn Farms, Inc. v. Johanns*, 397 F.3d 472, 476–77 (7th Cir. 2005) ("Anyway, if it is unduly 'coercive' to link agricultural subsidies to how the farmer uses (or misuses) agricultural land, it must be unduly 'coercive' to link the subsidy to the agricultural product. A farmer can't get federal payments for growing (or not growing) soybeans, without actually growing the soybeans or allowing the land to lie fallow. The sort of argument Horn Farms presses would demolish, not the Swampbuster legislation, but the whole system of agricultural subsidies, and indeed all federal legislation (including tax credits and deductions) linking financial rewards to the satisfaction of conditions."); *United States v. Dierckman*, 201 F.3d 915, 922 (7th Cir. 2000) ("Even though Congress may lack the authority to regulate directly a strictly intrastate wetland, the incentive provided by the Food Security Act is a valid exercise of the spending power.").

P. 24(a)(2), an intervenor's interest must be "direct, substantial, and legally protectable." *Union Elec. Co.*, 64 F.3d at 1161. As discussed above, *supra* at section III.B.2, the Proposed Intervenors' interests—including economic, health, aesthetic and recreational interests—are exactly the type of interests sufficient to satisfy Fed. R. Civ. P. 24(a)(2). *See Nat'l Parks Cons Ass'n*, 759 F.3d at 976 ("The threat of economic injury from the outcome of litigation undoubtedly gives a petitioner the requisite interest.") (citations omitted); *see also Mille Lacs Band of Chippewa Indians v. State of Minnesota*, 989 F.2d 994, (8th Cir. 1993). Proposed Intervenors also have a direct interest in the outcome of this case due to their long histories of advocating for the rights of sustainable family farmers at the local, state, and federal levels (James Decl. ¶¶ 6-7; Lehman Decl. ¶¶ 3, 19-22). *See South Dakota Farm Bureau, Inc. v. South Dakota*, 189 F.R.D. 560, 564–65 (D.S.D. 1999) (granting intervention to an organization that worked to preserve family farmers by directly participating in various activities that went beyond lobbying).

With respect to impairment, the *Union Electric* Court cautioned that a prospective intervenor need not show their interests would certainly be impaired absent intervention. *Union Elec. Co.*, 64 F.3d. at 1161–62. Rather, the test for intervention can be met by demonstrating their interest *may be* impaired, *id.*, a standard which is satisfied so long as an intervenor's recognized interests "would be directly impacted by [a] court order." *Nat'l Parks Cons Ass'n*, 759 F.3d at 976. As discussed above, *supra* at section III.B.3, Proposed Intervenors' members would be directly and negatively impacted—including through economic losses, increased health risks, and lost aesthetic and recreational enjoyment—if this court issued an order invalidating Swampbuster. *See id.*; *see also Mille Lacs*, 989 F.2d at 998. As a result, the second and third elements are met.

### 3. Defendants do not adequately represent Proposed Intervenors' interests.

Finally, the Sustainable Agriculture Groups are entitled to intervention as of right because the Defendants do not adequately represent their interests. A prospective intervenor generally carries a "minimal burden" of showing that existing parties do not adequately represent its interests. *Nat'l Parks Cons Ass'n*, 759 F.3d at 976. "Under the concept of *parens patriae*, however, when one of the existing parties is a governmental agency and the case concerns a matter of sovereign interest, the bar is raised, because in such cases the government is presumed to represent the interests of all its citizens." *Id.* (cleaned up).

There are at least two circumstances where the *parens patriae* presumption does not apply,[16] though, and both are present here: (a) if an intervenor's interest is "narrow" and "parochial" such that it doesn't "coincide with" the government's interest, *Nat'l Parks Cons Ass'n*, 759 F.3d at 977; and/or (b) if there is "no assurance" the government will maintain its position throughout case. *See Mille Lacs*, 989 F.2d at 1000–01.

### a. The *parens patriae* presumption does not apply because Proposed Intervenors' interests are narrow and parochial.

The *parens patriae* presumption "is triggered only to the extent the proposed intervenor's interests coincide with the public interest." *Nat'l Parks Cons Ass'n*, 759 F.3d at 976 (cleaned up). "Where those interests are disparate, even though directed at a common legal goal, [] intervention is appropriate." *Union Elec. Co.*, 64 F.3d at 1170. In particular, if a proposed intervenor's interest is "narrower" than, and therefore "not subsumed by" the government's interests, then "there is no

---

[16] The case law is not always clear about how this presumption operates. In some cases, courts conclude that the presumption is not even triggered and therefore only the standard "minimal" burden must be met. *See, e.g.*, *Mille Lacs*, 989 F.2d at 1000–01. In other cases, courts find that the presumption is triggered, but has been overcome given the circumstances. *See, e.g.*, *Mausolf v. Babbitt*, 85 F.3d 1295, 1303 (8th Cir. 1996). Other cases do not distinguish between these two situations and simply rule that the intervenor has established inadequacy of representation. *See, e.g.*, *Nat'l Parks Cons Ass'n*, 759 F.3d at 976. Under any approach, Intervenors establish inadequacy of representation for the reasons described above.

reason to think the government will represent" the intervenor's interests and the *parens patriae* presumption does not apply. *Mausolf v. Babbitt*, 85 F.3d 1295, 1303 (8th Cir. 1996) (internal citations omitted); *see also North Dakota Farm Bureau, Inc. v. Stenehjem*, No. 16-cv-137, 2017 WL 11679215, at *4 (D.N.D. Jan. 11, 2017) (inadequate representation found because "interests of Farmers Union are narrower than the public interest" of the state in defending statute against constitutional challenges); *Mille Lacs*, 989 F.2d at 1001 (inadequate representation found where landowners' interests in maintaining property values were "narrower and more parochial interests than the sovereign interest the state asserts in protecting fish and game").

Here, the Proposed Intervenors' "narrow" and more "parochial" interests do not "coincide with" the public interest. As explained in section III.B.2 above, invalidating Swampbuster would injure Sustainable Agriculture Groups and their members directly and specifically, beyond the general harms that might be faced by the public, including economic risks, health impacts, and injury to their aesthetic and recreational interests. Indeed, the Legislature understood when it created Swampbuster that certain "individuals, communities, farms, industries, and fish and wildlife resources located downstream of the converted land may end up paying the most significant costs" of wetland loss. *See* H.R. REP. NO. 99-271, at 78. Proposed Intervenors are precisely those "individuals, communities, [and] farms" that will pay the highest price if Swampbuster is eliminated. *Id.*

The government, by contrast, has a broad, general interest in defending Swampbuster against legal challenges. *North Dakota Farm Bureau v. Stenehjem* is particularly on point. In that case, the Farm Bureau sued the state of North Dakota to invalidate a state law limiting corporate ownership of farms. 2017 WL 11679215, at *1. North Dakota Farmers Union sought to intervene on the state's side to defend the law. Even though the state and the Farmers Union shared a

"common legal goal of protecting [the law]," the court concluded the Farmers Union's "interests in the law [were] different." *Id.* at *4. For its part, the state had "a broad interest in protecting its laws from federal constitutional challenges." *Id.* By contrast, the North Dakota Farmers Union had more "personal interests" in the lawsuit, "which they [saw] as jeopardizing their economic, social and cultural interests and welfare." *Id.*

The same is true here. Proposed Intervenors' interest in Swampbuster is deeply personal, as described above. Moreover, USDA's substantive interests are also much broader than Proposed Intervenors' interests, as the agency must always balance potentially conflicting goals, including "promot[ing] agriculture production" on the one hand, and "preserv[ing] our Nation's natural resources" on the other.[17] Conservation programs like Swampbuster and Sodbuster are only a small part of USDA's remit and will not always be the agency's top priority. Indeed, the agency could at any point decide that the balance should shift away from preserving natural resources and toward promoting more agricultural production. As a result, USDA's interests do not "coincide" with Proposed Intervenors' narrower, more personal interests and the government cannot adequately represent them. *See Nat'l Parks Cons Ass'n*, 759 F.3d at 976; *see also North Dakota Farm Bureau*, 2017 WL 11679215, at *4 (inadequate representation found because the state "must represent the varied interests of all [] citizens, including rural, urban, farm, non-farm, [] and many more.").

> **b. The *parens patriae* presumption does not apply because the Defendants could change their position.**

Intervention is appropriate where "there is no assurance that the state will continue to support all the positions taken in its initial pleading." *See Mille Lacs*, 989 F.2d at 1001 (intervention appropriate even though government and proposed intervenors filed "almost identical" answers). That is the case here. Currently, Defendants' answer and affirmative defenses suggest they intend

---

[17] MISSION STATEMENT ACADEMY, https://mission-statement.com/usda/ (last visited Oct. 1, 2024).

to defend the programs but there is "no assurance" that will always be the case, particularly if there is an administration change after the November 2024 election. *Id.* USDA has multiple competing priorities, and the relative balance of those priorities could shift after the election. *See Mausolf*, 85 F.3d at 1303. Indeed, Project 2025, a "Presidential Transition Project" for a future conservative presidential administration, calls for ending both Sodbuster and Swampbuster.[18] This creates ample doubt that Defendants will adequately represent Proposed Intervenors' interests in the future. *Id.*; *see also Nat'l Parks Cons Ass'n*, 759 F.3d at 977 (inadequate representation where intervenor "cannot be assured that the [agency's] current position will remain static or unaffected by unanticipated policy shifts." (cleaned up)). Thus, the *parens patriae* presumption does not apply and Proposed Intervenors should be allowed to participate. *Id.*

Additionally, under any administration, this lawsuit could eventually be resolved by settlement rather than by litigation. The Eighth Circuit recognizes that the government's interests can "diverge substantially" from intervenors' interests in the settlement context. *See Mille Lacs*, 989 F.2d at 1001. "A potential conflict of this sort is sufficient to satisfy the proposed intervenors' minimal burden" of showing inadequate representation. *Id.*

Finally, Defendants do not oppose intervention.[19] Courts have interpreted such a position as the party effectively conceding that the Proposed Intervenors' interests are different from the government's interests. *See North Dakota Farm Bureau*, 2017 WL 11679215, at *4 ("[T]he State

---

[18] *See* Daren Bakst, *Chapter 10 Department of Agriculture in* PROJECT 2025, MANDATE FOR LEADERSHIP: THE CONSERVATIVE PROMISE, 304 (Paul Dans & Steven Groves eds., 2023) (the next Administration should . . .[r]eform NRCS wetlands and erodible land compliance and appeals."), https://static.project2025.org/2025_MandateForLeadership_CHAPTER-10.pdf; *see also* PROJECT 2025, https://www.project2025.org/ (last visited Oct. 1, 2024).
[19] Pursuant to Local Rule 7(k), on August 15, 2024, counsel for Intervenors contacted counsel for Plaintiff CTM Holdings, LLC as well as counsel for the Defendants about their intent to seek intervention. Defendants responded that they do not intend to oppose this intervention motion while Plaintiff indicated it did.

agrees that Farmers Union should be allowed to intervene and essentially concedes it is unable to adequately represent [its] interests."). As a result, intervention should be allowed.[20]

### D. Alternatively, the Court Should Grant Permissive Intervention

If the Court denies intervention of right, Proposed Intervenors seek permissive intervention. Under FED. R. CIV. P. 24(b)(1)(B), the court may grant intervention to parties that have "a claim or defense that shares with the main action a common question of law or fact." Proposed Intervenors have specific interests and stand to suffer the harms described above. They seek to assert defenses against the claims raised by the Plaintiff in this case but will provide the court with different perspectives than the existing parties. *See Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179, 211 n.4 (2022).

A court's decision on permissive intervention is discretionary, *South Dakota ex rel Barnett*, 317 F.3d at 787, and the court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." FED. R. CIV. P. 24(b)(3). Proposed Intervenors file this motion before the deadline proposed by the other parties for motions to add third parties, so their intervention will cause no delay or prejudice. The criteria in Rule FED. R. CIV. P. 24(b) support permissive intervention.

### IV. <u>CONCLUSION</u>

Plaintiff's challenge to the Swampbuster program has the potential to end important protections for wetlands and highly erodible land. The Sustainable Agriculture Groups advocate for clean water and sustainable agricultural practices, and their member declarants are farmers directly impacted by the environmental and economic benefits of Swampbuster and the similarly

---

[20] Sustainable Agriculture Intervenors are filing **<u>Exhibit A</u>**, an answer to the Complaint, as the pleading required by Federal Rule of Procedure 24(c). Each Proposed Intervenor is also concurrently filing a corporate disclosure statement as required by Local Rule 7.1(c).

structured Sodbuster program. The elimination of Swampbuster through this litigation would harm Proposed Intervenors and their members. For all of these reasons, the Proposed Intervenors request the Court grant their motion for intervention of right or alternatively, for permissive intervention.

DATED: October 2, 2024

Respectfully Submitted,

By: */s/ Joshua T. Mandelbaum*
    Joshua T. Mandelbaum (AT0010151)
    Kathleen Garvey, *pro hac vice pending*
    Environmental Law & Policy Center
    505 5th Ave. Suite 333
    Des Moines, IA 50309
    jmandelbaum@elpc.org
    kgarvey@elpc.org
    (515) 244-0253
    (312) 673-6500

*Attorneys for Proposed Intervenor Iowa Farmers Union*

By: */s/ Michael R. Schmidt*
    Michael R. Schmidt (AT0013962)
    Iowa Environmental Council
    505 5th Avenue, Suite 850
    Des Moines, IA 50309
    schmidt@iaenvironment.org
    (515) 244-1194 x212

*Attorney for Proposed Intervenor Iowa Environmental Council*

By: */s/ Dani Replogle*
    Dani Replogle, *pro hac vice pending*
    Food & Water Watch
    1616 P Street, NW Suite 300
    Washington, D.C. 20036
    dreplogle@fwwatch.org
    (202) 683-4947

*Attorney for Proposed Intervenors Food & Water Watch and Dakota Rural Action*