IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| CTM HOLDINGS, LLC, an Iowa limited liability company, | ) ) ) | |
| Plaintiff, | ) ) ) | No. 24-CV-02016-CJW-MAR |
| vs. | ) ) | **Oral Argument Requested** |
| THE UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as Secretary of the United States Department of Agriculture[1]; THE NATURAL RESOURCES CONSERVATION SERVICE; LOUIS ASPEY, in his official capacity as Chief of the Natural Resources Conservation Service; and JON HUBBERT, in his official capacity as Iowa State Conservationist, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**UNITED STATES' MEMORANDUM IN RESISTANCE TO
CTM HOLDINGS, LLC'S MOTION FOR SUMMARY JUDGMENT**

---

[1] Brooke Rollins is the Secretary of the United States Department of Agriculture and is substituted for Mr. Washington (and previously, Mr. Vilsack,) pursuant to Fed. R. Civ. P. 25(d). Consistent with the rule, this substitution occurs "automatically" and without further order of the Court.

# Table of Contents

INTRODUCTION ............................................................................................ 3

FACTS .......................................................................................................... 4

ARGUMENT ................................................................................................. 5

    I.    CTM Does Not Have Standing. ............................................................ 5

    II.    The Swampbuster Statute is Constitutional. ............................................. 9

        A.    Swampbuster does not "violate" the Commerce Clause. ........................ 9

        B.    Swampbuster does not effect an uncompensated taking. ..................... 12

    III.    The Challenged Rules Are Supported by the Best Interpretation of the Statute. ............................................................................................... 15

        A.    The Review Regulation is consistent with the best interpretation of the Swampbuster statute. ...................................................................... 15

        B.    The Rule Defining a "Converted Wetland" is Consistent with the Statutory Definition. ....................................................................... 16

CONCLUSION ............................................................................................ 17

CTM's Motion is premised on several fundamental errors about both the undisputed facts and the law. CTM argues that it requested NRCS to review the 2010 Certified Wetlands Determination; it did not. It argues that Swampbuster directly regulates its land use; it does not. CTM contends that it "does not receive compensation from the USDA for its compliance with wetland conservation;" it does[3]. It boldly states that it "cannot use the 9 acres of wetland in an economically beneficial or productive manner without violating [S]wampbuster"; but it received an economic benefit from timber production on those 9 wetland acres soon after buying the property. Finally, CTM suggests that any regulation that differs in language from the related statute exceeds the agency's authority, even when the language is directly encompassed in the statute's meaning or is consistent with Congress's delegation of authority to administer the statute; that is not so.

The undisputed record and a plain reading of the statutes being challenged paint a far different picture than that presented by CTM. First, CTM lacks standing. CTM cannot challenge USDA's denial of a review request CTM never made, and it faces only an entirely speculative risk of loss. Next, Swampbuster is

---

[2] "USDA App." refers to the Appendix submitted with USDA's Motion for Summary Judgment. (Doc. No. 56-2) "CTM App." and "Intervenors App." refer to the appendices submitted with the Motions for Summary Judgment filed by CTM and the Intervenors, respectively. (Doc. Nos. 54-3 to 54-6 and 57-3 to 57-9)

[3] The compensation CTM receives contingent on its compliance with the wetland regulations in the form of its tenant's participation in the Conservation Reserve Program is CTM's argued basis for standing. It cannot both face the loss of compensation when analyzing standing but receive no compensation when analyzing the merits.

merely part of a voluntarily set of benefits properly enacted under Congress's Spending Clause authority. Lastly, the challenged regulations fall directly within USDA's delegated authority and are consistent with the best interpretation of the statutory language. As a result, CTM's Motion should be denied.

<u>FACTS</u>

Several of CTM's factual allegations are false or require context. First, it is undisputed that NRCS has never denied a request by CTM to review the 2010 Certified Wetland Determination because CTM never made such a request. Nevertheless, CTM contends that "Plaintiff submitted the AD-1026 form [sic] the purposes of … requesting a wetlands determination." (CTM MSJ Brief p. 2). But the email string CTM cites to support this contention shows this to be untrue. USDA's recommendation to submit Form AD-1026 was in response to a statement from Conlan that he planned to "remove the trees, but not the stumps, from the determined wetlands" and Conlan's request that USDA "mark the determined wetlands area … so we do not remove stumps from the determined wetlands." CTM App. 43. Thus, CTM's stated purpose in filing Form AD-1026 was so that CTM's logging operations would be consistent with the 2010 Certified Wetland Determination, not challenging it. In response, NRCS did exactly what Conlan asked of it—it determined the property did not contain any wetland other than the areas already designated in 2010 and flagged the property.

Similarly, the undisputed record does not support CTM's claim, supported only by its owner's declaration, that CTM "cannot use the 9 acres of wetland in an

4

economically beneficial or productive manner without violating Swampbuster."

(CTM MSJ Brief, p. 3). CTM has already made economically beneficial use of the

wetland without jeopardizing Swampbuster compliance. Soon after it acquired the

property, CTM sold the timber on the property, including trees in the designated

wetland areas, for $26,500. (Intervenors App. 47).

## ARGUMENT

I.      CTM Does Not Have Standing.

The Court should find that CTM has not met its burden to establish

standing. "The party invoking federal jurisdiction bears the burden of establishing

standing—and, at the summary judgment stage, such a party can no longer rest on

... 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific

facts.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013) (cleaned up).

> To seek injunctive relief, a plaintiff must show that he is under threat
> of suffering 'injury in fact' that is concrete and particularized; the
> threat must be actual and imminent, not conjectural or hypothetical; it
> must be fairly traceable to the challenged action of the defendant; and
> it must be likely that a favorable judicial decision will prevent or
> redress the injury.

*Miller v. Thurston*, 967 F.3d 727, 734 (8th Cir. 2020).

CTM's alleged injuries fall short. CTM contends that it has standing based

on: (1) a decrease in the property's marketability and sales price; (2) the risk that its

tenant may lose CRP payments or other farm benefits; and (3) the risk that CTM

itself may lose eligibility for USDA programs including federal crop insurance.

First, CTM's owner avers that the 2010 Certified Wetland Determination reduces

the property's marketability and value. In support, CTM cites an email to USDA

5

officials sent by the former owner's broker stating he had appraised the property the prior December and that the wetlands designation "will very likely impact the market value of the property." CTM App. 102. In that email, sent on July 8, the broker predicted the property would be "going on the market early next week." *Id.* By July 14, apparently only one week after the broker first learned of the wetland determination, the sellers accepted CTM's offer to purchase the property. (Intervenors App. 40-46). And if the wetland determination reduces the property's market value, CTM has benefitted as much as it has lost—it bought the property at the reduced value. *Contrast Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 19 n.1 (2018) (explaining that an injury exists when a plaintiff suffers a decrease in market value of property plaintiff *already owned* at the time the regulation took effect). Simply put, CTM has not presented evidence of harm to its bottom line or that the relief it seeks would increase the property's value.

CTM's tenant's possible loss of farm benefits does not provide CTM standing. A party seeking to bring a claim "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). A party seeking standing based on injury to another must make two additional showings: (1) that it "has a 'close' relationship with the person who possesses the right" and (2) that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 129-30. Accepting the first factor *arguendo*, CTM presents no argument that its

6

tenant is unable to speak for itself. Without doing so, CTM has no standing based on the concerns of its current or future tenants.

Finally, CTM presents no evidence that CTM itself is under threat of a concrete and particularized injury. CTM argues that the "object of" a government action nearly always has standing to challenge it. (CTM Brief, p. 5). But landowners are not the "object of" Swampbuster simply by owning land, because Swampbuster does not directly regulate land use. Swampbuster, by its plain language, affects only eligibility for particular payments, loans, and programs outlined by statute. 16 U.S.C. § 3821(d)(1). Landowners are only affected by Swampbuster if they benefit from these particular payments, loans, or programs. CTM has not identified any benefits it stands to lose, and its lease assigns to its tenant 100% of the benefits of participation in "any offered program by the U.S. Department of Agriculture". (Intervenors App. 31). As a result, CTM itself is not harmed should benefits be withheld. Accordingly, CTM has neither suffered, nor is in danger of suffering, a concrete and particularized injury.

Furthermore, CTM's claimed injury is far from "actual and imminent." CTM posits that its tenant could violate Swampbuster, causing CTM to lose "eligibility for USDA programs with respect to that farm" or a "reduction of [CTM's] federal crop insurance." (CTM Brief, p. 5). But CTM presents no evidence that its tenant, whose lease is based on the existing number of recorded crop acres (*Id.*), has any intention of altering the wetland areas. Even if CTM or its tenant had an actual or imminent desire to do so, alteration of the wetland areas could affect CTM's

7

program eligibility only after consideration of a number of factors. (USDA Brief, p. 8-9). Simply put, CTM presents no evidence that it actually and imminently stands to suffer any injury at all. Without doing so, it has not established standing.

Finally, there is no final agency action, and CTM has not exhausted an available remedy: simply making a written request for USDA to review the 2010 Certified Wetland Determination. CTM insists that USDA "refus[ed] to review the current wetland delineation" and "den[ied] CTM Holdings' review requests". (CTM Brief, p. 6). Neither is true, because CTM never made a request. CTM apparently treats as a denial USDA's January 23, 2023 letter in response to CTM's AD-1026 submission. (CTM Brief p. 6). But submitting a Form AD-1026 is not how a landowner requests review (USDA App. 4, ¶ 13), nothing on the form CTM submitted suggests it was requesting review (USDA App. 29-30), and nothing in CTM's discussions with USDA prior to submitting the form suggests CTM intended it as a request for review. (CTM App. 40-43). And the responsive letter plainly states that NRCS was not conducting a review because CTM had not asked for one. (USDA App. 41). It identifies that CTM has the right to request review and outlines the simple steps necessary to do so. (*Id.*) "[A]n agency's mere failure to act is usually not a final agency action triggering judicial review, and the Supreme Court has declared that the APA does not afford an implied grant of subject-matter jurisdiction." *Org. for Competitive Markets v. U.S. Dep't of Agric.*, 912 F.3d 455, 462 (8th Cir. 2018). A claim is available "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Norton v. S. Utah*

*Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis original). Finally, "[t]he legal issues exception is extremely narrow and should only be invoked if the issues involved are ones in which the agency has no expertise or which call for factual determinations." *Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 440 F.3d 992, 1001 (8th Cir. 2006). The January 23, 2023 letter simply acknowledged the current state of affairs and provided CTM additional information about how it could request review. CTM never did so; as a result, NRCS never considered or denied a review request CTM never made. Because CTM's challenge is based on a denial that never occurred, the Court should dismiss the case.

II.     The Swampbuster Statute is Constitutional.

   A.  Swampbuster does not "violate" the Commerce Clause.

CTM's Commerce Clause argument misses the mark from its first sentence. CTM contends "Swampbuster by its plain language regulated private property" and that, because "wetlands" are not either channels or instrumentalities of interstate commerce the Swampbuster provisions are beyond Congress's Commerce Clause authority. But Swampbuster regulates crop production, not private property. If it does not choose to participate in farm programs, a property owner, including CTM, can make any use of wetland areas on its property with no effect from Swampbuster whatsoever. Swampbuster does not prevent CTM from altering, converting, or even destroying its wetlands. Swampbuster only affects a program participant if the participant alters or manipulates its wetlands for one purpose: production of an

9

agricultural commodity. Even then, Swampbuster only affects a property owner if it also chooses to participate in USDA farm programs.

As part of a spending provision, Swampbuster falls well within Congress's Spending Clause authority; however, even CTM's imagined "direct regulation" version of Swampbuster would likely be constitutional. Congress's Commerce Clause authority to regulate agricultural products is well established. *See, e.g. West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192 (authority to "enact legislation providing for the regulation of prices paid to farmers for their products" is Congress's alone); *Monson v. Drug Enforcement Admin.*, 589 F.3d 952 (8th Cir. 2009) (authority to regulate both interstate and intrastate production of marijuana); *Gonzales v. Raich*, 545 U.S. 1 (2005); *Bruhn's Freezer Meats of Chicago, Inc. v. U. S. Dep't of Agric.*, 438 F.2d 1332, 1340 (8th Cir. 1971) (authority to regulate deceptive practices in the production and sale of meat). Swampbuster regulates the production of certain defined agricultural commodities by choosing not to subsidize production that destroys wetlands. Indeed, Swampbuster is found within the Food Security Act ("FSA"), which also included provisions affecting the production of certain agricultural products, including income and price supports. Choosing not to subsidize production that requires wetland destruction is well within Congress's authority to regulate the production and sale of agricultural products.

However, even more fundamentally, Swampbuster cannot violate the Commerce Clause because it is not a "creature of the Commerce Clause." Rather,

> The FSA is not an exercise of direct regulatory power; instead, the FSA
> conditions the receipt of USDA farm benefits on the preservation of

10

> wetlands. This is indirect regulation invoking the spending power and is not limited by the enumeration of Congressional powers in Article I, section 8 of the Constitution.

*U.S. v. Dierckman*, 201 F.3d 915, 922 (7th Cir. 2000); *Foster v. United States Dep't of Agric.*, 609 F. Supp. 3d 769, 781 (D.S.D. 2022) *aff'd*, 68 F.4th 372 (8th Cir. 2023), *cert. granted, judgment vacated sub nom. Foster v. Dep't of Agric.*, 144 S. Ct. 2707 (2024), and *vacated*, No. 22-2729, 2024 WL 4717247 (8th Cir. Nov. 7, 2024) (quoting *Dierckman*). Even if Swampbuster's objectives were beyond Congress's Commerce Clause authority, "objectives not thought to be within Article I's 'enumerated legislative fields, may nevertheless be attained through the use of spending power and the conditional grant of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

CTM counters this clear statement from *Dole* by citing only a case decided more than 50 years earlier. But "the analysis in *Butler* has been discredited as flawed and unworkable, and has not been followed." *Kansas v. United States*, 214 F.3d 1196, 1201 n. 6 (10th Cir. 2000); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 572 (2012) (citing *Butler* as an example of an outdated view of the extent of taxing authority).

With no support for its argument that Swampbuster is outside the Spending Clause, CTM argues that it "unconstitutionally conditions the receipt of benefits on producers' waiver of the constitutional protections provided by the Commerce Clause". (CTM Brief, p. 15). But Swampbuster requires no such thing. Program participants do not waive any rights they have arising under the Commerce Clause.

11

It is simply that Swampbuster is authorized by another distinct constitutional power. CTM's argument is inconsistent with *Dole*, *NFIB*, and essentially every other modern Spending Clause case. As a result, the Court should find that Swampbuster does not "violate" the Commerce Clause.

B. <u>Swampbuster does not effect an uncompensated taking.</u>

At its most fundamental level, CTM's Takings Clause argument fails for the same reason it has no success under the Commerce Clause—it simply argues against a version of Swampbuster that does not exist. CTM argues against a version of Swampbuster that grants the government an uncompensated easement or some other type of property interest equivalent to "a permanent physical occupation" over agricultural land (CTM Brief, p. 7-11); but that is not, in fact, what Swampbuster does. Swampbuster provides the United States no property interest in CTM's land. Even when a landowner has accepted farm benefits, the United States has no ability to prevent a landowner from making any use of its property, including converting designated wetlands. The government's only available remedy is to disqualify the landowner from farm benefit programs.

"[W]here an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus v. Allard*, 444 U.S. 51, 65–66 (1979) (finding a prohibition on the sale of certain bird artifacts did not amount to a taking of artifacts legally owned prior to the prohibition). Here, Swampbuster destroys none of CTM's property rights. A regulation on its own may constitute a taking, but only in "the

extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 330 (2002). That is not the case here, evidenced by CTM's lease of the property to its tenant and sale of timber harvested from the property, including from the designated wetland areas.

Still, Swampbuster is neither an assignment of a property interest nor a regulation of property. It is simply a condition placed on benefits farmers may voluntarily decide whether to accept. CTM argues that these conditions amount to a taking. (CTM Brief, p. 10). Cases on the government's authority to condition benefits on landowners granting certain property rights break into two categories. On the one hand, when the benefit the government grants is simply the right to make "basic and familiar us[e]" of one's property in a way it would be able to use it absent government intervention at all, the rights given up must be related and proportional to the benefit. *Horne v. Department of Agriculture*, 576 U.S. 350 (2015) (benefit was only permission to sell ordinary goods on the open market); *see Nollan v. California Coastal Commission*, 483 U.S. 825 (1987) (benefit was permission to build on the landowner's own property); *Dolan v. City of Tigard*, 512 U.S. 374 (1994) (benefit was only permission to build on landowner's own property);; *Koontz v. St. Johns River Water Management Dist.*, 570 U.S. 595 (2013) (land use permit). On the other hand, when the government offers a special, valuable benefit conditioned upon a landowner giving up a property right, no taking has occurred. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) (registration to sell dangerous

products in highly regulated market conditioned on giving up the right not to disclose certain trade data); *Baker County Medical Services, Inc. v. U.S. Atty. Gen.*, 763 F.3d 1274 (11th Cir. 2014) (federal money in the form of Medicare reimbursement conditioned on giving up right to exclude certain patients for whom compensation was limited to Medicare rate); *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984) (Medicaid payment conditioned on price controls). Conditions attached to financial benefits to which a voluntary participant would not otherwise be entitled are not takings because the participant can weigh the costs and benefits and choose whether to participate. *Baker*, 763 F.3d at 1279. This is true even when the financial benefits provide a "strong financial inducement." *Id.* The Takings Clause, by its plain language, contemplates that individuals may grant property rights to the government in exchange for just compensation.

Swampbuster falls squarely in the latter category. The benefits farmers receive in exchange for Swampbuster compliance—direct payouts of federal money in the form of subsidies or other farm program benefits—are valuable, "special government benefit[s]" on the order of Medicare or Medicaid payments, and to which CTM has no pre-existing right in the absence of government regulation. *Cf. Horne*, 576 U.S. at 366. Because participation in the farm programs is voluntary, participants can assess the costs and benefits and choose whether to participate. This does not change simply because the benefit – participation in USDA programs – may provide farms a "strong financial inducement" to participate.

14

III.   The Challenged Rules Are Supported by the Best Interpretation of the
       Statute.

   A. The Review Regulation is consistent with the best interpretation of the
      Swampbuster statute.

In this case, CTM advances the same interpretation of 16 U.S.C. § 3822(4)'s

"duration of certification" provision the Eighth Circuit Court of Appeals found to be

"absurd" less than two years ago. *Foster v. United States Dep't of Agric.*, 68 F.4th

372, 377 (8th Cir. 2023), *cert. granted, judgment vacated sub nom. Foster v. Dep't of*

*Agric.*, 144 S. Ct. 2707 (2024), and *vacated*, No. 22-2729, 2024 WL 4717247 (8th Cir.

Nov. 7, 2024). For the reasons explained in USDA's brief in support of its motion for

summary judgment, (Doc. No. 59 at 20-26), the statute's text contemplates that

USDA would set forth the form and conditions for a review request. CTM contends

that the statute's explanation that a certified wetland determination remains valid

"until such time as the person affected by the certification requests review" plainly

means that there are to be no requirements at all related to the form or content of a

review request and allows affected persons the ability to endlessly invalidate final

wetland determinations for any reason, or no reason at all. However, the plain

language of the statute addresses only the duration a final wetland determination

remains in effect, not the content or form of a review request. Authority to set forth

those conditions is found in Congress's express delegation to USDA of authority to

adopt "such regulations as [it] determines to be necessary to ensure a fair and

reasonable application of the limitations under" Swampbuster. 16 U.S.C. § 3846(a).

This interpretation is also consistent with the prior rulings of this Court. In *Branstad v. Veneman*, this Court rejected USDA's argument that the "person affected by the certification" referred to in subsection (a)(4) meant only the person affected *at the time of the certification* and did not allow for a review request by a subsequent landowner. 212 F.Supp.2d 976, 996-97 (N.D. Iowa 2002). In *B&D Land and Livestock Co. v. Veneman*, this Court also rejected USDA's argument that a landowner had no right to request review because it had withdrawn its initial timely appeal of the wetland determination. 332 F.Supp.2d 1200,1205-06 (N.D. Iowa 2004). Here, USDA challenges neither of these holdings. Regardless of the fact that CTM did not own the Subject Property at the time of the 2010 Certified Wetland Determination, and regardless of whether either CTM or a prior owner requested review, USDA agrees that CTM is permitted to make a review request. To do so, USDA's Review Regulation addresses only the required form and content of the request. CTM does not cite a single case in which a court has agreed with its absurd interpretation of subsection (a)(4). This Court should find that USDA's Review Regulation is consistent with the best interpretation of the Swampbuster statute.

B.  The Rule Defining a "Converted Wetland" is Consistent with the Statutory Definition.

Finally, CTM provides little basis for its challenge of 7 C.F.R. § 12.2(a)'s definition of "converted wetlands." CTM apparently argues that if a definition found in a regulation differs in any way at all from the definition found in the related statute then the regulation is invalid. Certainly, USDA's regulations "may not

16

exceed a statute or modify its provisions." *Global Van Lines, Inc. v. Interstate Commerce Com.*, 714 F.2d 1290, 1296 (5th Cir. 1983). But CTM makes no argument that the words "the removal of woody vegetation" modify or exceed the terms found in the statute. In fact, it is undisputed that the removal of woody vegetation is one way landowners may manipulate wetlands for the purpose of making possible the production of an agricultural commodity. (USDA App. 6 ¶¶ 19-20). Because it is undisputed that the language found in the regulation's definition does not exceed or modify the statutory language, CTM's challenge to the Review Regulation fails.

CONCLUSION

The undisputed facts and a fair reading of Swampbuster make resolution relatively straightforward. CTM lacks standing, because it identifies no actual and imminent harm it faces that is fairly traceable to Swampbuster. If CTM believes the 2010 Certified Wetland Determination is erroneous, it has an available remedy that it has not exercised: simply submitting a written request for review. On the merits, Swampbuster is not direct wetland regulation; it is a condition on valuable benefits USDA offers and which participants may voluntarily accept or decline. As a result, Swambuster falls well within Congress's Spending Clause authority and does not effect an uncompensated taking. Finally, the challenged administering regulations do not exceed the authority expressly delegated to the USDA. For all these reasons, the Court should deny CTM's motion and grant summary judgment in favor of the United States.

17

Respectfully submitted,

TIMOTHY T. DUAX
United States Attorney

By:   */s/ Brandon J. Gray*
      */s/ Brian J. Keogh*

BRANDON J. GRAY
BRIAN J. KEOGH
Assistant United States Attorney
111 7th Avenue SE, Box 1
Cedar Rapids, IA 52401
Phone: (319) 363-6333
Fax: (319) 363-1990
Brandon.Gray2@usdoj.gov
Brian.Keogh@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2025, I
electronically filed the foregoing with the Clerk of
the Court using the CM/ECF system which will
send notification of such filing to the parties or
attorneys of record.

UNITED STATES ATTORNEY

BY:   */s/ Ashley Wessels*

18