# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

| | |
|---|---|
| CTM HOLDINGS, LLC, an Iowa limited liability company,<br><br>        Plaintiff,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as the Secretary of the United States Department of Agriculture; NATURAL RESOURCES CONSERVATION SERVICE; LOUIS ASPEY, in his official capacity as Chief of the Natural Resources Conservation Service; and JON HUBBERT, in his official capacity as Iowa State Conservationist,<br><br>        Defendants.[1]<br><br><br>IOWA FARMERS UNION, IOWA ENVIRONMENTAL COUNCIL, FOOD & WATER WATCH, and DAKOTA RURAL ACTION,<br><br>        Intervenors. | No. 24-CV-2016-CJW-MAR<br><br><br>**MEMORANDUM OPINION AND ORDER** |

---

[1] Originally, Thomas Vilsack was a named defendant as Secretary of the USDA, and Terry Cosby was a named defendant as Chief of the Natural Resources Conservation Service. Defendants note that these two officials have been replaced by the individuals now named in the caption. (Doc. 59, at 1 n.1). Consistent with Federal Rule of Civil Procedure 25(d), these officers' successors are "automatically substituted as a party." It appears that, perhaps, the NRCS has switched chiefs again since the parties' most recent filings. But the Court will keep the caption consistent with that reflected in defendants' most recent filings. Any error of this sort is of no consequence, as noted in Rule 25(d).

# TABLE OF CONTENTS

I.    INTRODUCTION ……………………………………………………… 3

II.   FACTUAL BACKGROUND …………………………………………… 3

III.  SUMMARY JUDGMENT STANDARD ……………………………… 7

IV.   ANALYSIS……………………………………………………………… 9

      A.    Defendants' Motion for Summary Judgment …………………… 9

      B.    Intervenors' Motion for Summary Judgment ……………………10

            1.    Standing ……………………………………………………11

            2.    Constitutionality of Swampbuster …………………………15

            3.    Unconstitutional Conditions………………………………18

            4.    USDA Rule Defining "Converted Wetland" ………………24

            5.    USDA Review Regulation…………………………………28

V.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT………………28

VI.   CONCLUSION ………………………………………………………29

# I.  INTRODUCTION

There are several motions before the Court.  Defendants filed a motion for summary judgment and a brief in support.  (Docs. 56 & 59).  Plaintiff resisted (Doc. 65) and defendants filed a reply (Doc. 72).  Plaintiff also filed a motion for summary judgment and brief in support.  (Docs. 57 & 57-1).  Defendants resisted (Doc. 67) and plaintiff filed a reply (Doc. 71).  Finally, intervenors filed a motion for summary judgment and/or dismissal (Doc. 54) as well as a number of other filings.  (Docs. 66 & 70).  Plaintiff's resistance to defendants' motion for summary judgment also resisted intervenors' motion for summary judgment.  (Doc. 65).

On March 31, 2025, the Court heard oral argument on all three motions.  (Doc. 73).

For the following reasons, defendants' and intervenors' motions for summary judgment (Docs. 56 & 54) are **granted** and plaintiff's motion for summary judgment (Doc. 57) is **denied**.

# II.  FACTUAL BACKGROUND

In September 2022, plaintiff purchased three contiguous parcels of land consisting of 71.85 acres in Delaware County, Iowa.  (Doc. 67-1, at 2).  James Conlan is plaintiff's principal owner.  (Doc. 65-1, at 2).  The previous owner of the land used about forty acres for agriculture, enrolled about 10 acres in the Conservation Reserve Program, and the remaining approximately twenty-one acres were forested.  (Doc. 67-1, at 2).  The Conservation Reserve Program contract—under which the government made payments to the landowner to conserve the land—expired in 2024.  (*Id.*).  In 2010, the United States Department of Agriculture ("USDA") determined that nine of the twenty-one forested acres were "wetland."  (*Id.*).

When plaintiff was under contract to purchase the land, Conlan began emailing with USDA representatives regarding wetland determinations.  (*Id.*, at 3).  Initially, in

July 2022, Conlan asked for the employee's "help with the process of seeking" a redetermination of the nine acres previously denoted as wetlands, among other things. (Doc. 56-2, at 58–59). Conlan noted that one of his plans for the property was to remove trees from several areas of the property. (*Id.*).

In August 2022, a USDA employee emailed Conlan regarding several things. The employee noted, in part, that "any logging or widespread tree removal could potentially create a wetland violation situation" and a wetland violation "would jeopardize all financial benefits associated to the farm, including those of any tenants associated to the farm, and possibly their other farming interests." (*Id.*, at 56). The employee's point, it seems, was to explain that plaintiff would be wise to request a wetland determination for the land which previously had not had a wetland determination.

On October 7, 2022, Conlan signaled in an email that he wanted to remove the trees (but not the stumps) from the existing wetland, and remove the trees and stumps from the rest of the forested land (upon which no wetland determination had been made) to make that land ready for farming. (*Id.*, at 54–55).

On October 11 and 12, 2022, several USDA representatives told Conlan in emails that, because plaintiff planned on removing trees and stumps in the undetermined land (i.e., the land upon which no wetland determination had been made), plaintiff would need to submit a form AD-1026 to get a wetland determination completed on the then-undetermined land. (*Id.*, at 51–53).

On October 12, 2022, plaintiff signed and submitted a form AD-1026. (Doc. 57-6, at 9–10). The form is entitled "Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification." (*Id.*). Plaintiff claims it submitted the form for several reasons, including "requesting a wetlands redetermination." (Doc. 57-2, at 2). Defendants disagree. Defendants state that plaintiff's purpose in submitting the form was to "delineate the wetland areas in advance of [plaintiff]'s plan to remove trees on

4

both wetland and non-wetland areas." (Doc. 67-1, at 4). Defendants further state that submission of a form AD-1026 "is not a request for review of an existing wetland determination, and nothing on the Form AD-1026 [plaintiff] submitted indicated that [plaintiff] intended to request a review." (*Id.*).

Plaintiff cites to a declaration by Conlan wherein Conlan states that his purpose in submitting the form AD-1026 was to request a wetlands redetermination, among other things. (Doc. 57-3, at 8). Plaintiff also cites to a string of emails which include, mostly, USDA and Natural Resources Conservation Service ("NRCS") employees' internal emails discussing how to mark plaintiff's land (as had been requested by plaintiff) so plaintiff knew which land had been determined as a wetland previously. (Doc. 57-5, at 2–4). The employees also discussed in the emails recommending to Conlan that he fill out a form AD-1026 for non-inventoried areas. (*Id.*). Non-inventoried areas are areas for which no wetland determination has previously been made.

Defendants cite to the filled out form AD-1026, which, as defendants state, says nothing about a redetermination. (Doc. 56-2, at 31–33). Defendants also cite to a declaration by a USDA/NRCS employee, Jason Outlaw, who states he is the "National Leader for Wetland and Highly Erodible Land Conservation." (*Id.*, at 3). Outlaw states that when a person submits a form AD-1026, if it requests a wetland determination, NRCS will complete a certified wetland determination "only for the portions of that tract that are then 'not certified.'" (*Id.*, at 6).

Later, on November 5, 2022, Conlan noted in emails his understanding that, before he removed the stumps from the area without a prior wetland determination, he would need a wetland determination. (Doc. 56-2, at 50). Conlan eventually stated, on November 7, 2022, that it was his understanding that he did "not need a further wetland

5

determination until" he sought "to remove stumps from determined wetland or until [he] intend[s] to bring into production land that has been cleared." (*Id.*, at 49).[2]

On January 23, 2023, the NRCS field office—specifically, wetland specialist Russ Wolf—sent plaintiff a letter which included a "Wetland Preliminary Technical Determination." (Doc. 57-6, at 12–20). This wetland determination was in regard to the forested area on the land which previously did not have any wetland determination. The NRCS determined that all of the previously non-certified land was not wetland. (*Id.*, at 15–19). That is, all of the forested land, other than the nine acres which were determined to be wetland in 2010, was determined not wetland.

The NRCS/USDA—again, specifically wetland specialist Wolf—sent plaintiff a second letter on January 23, 2023. (Doc. 57-7, at 1–10). This letter states that the NRCS received plaintiff's request for a new certified wetland determination. (*Id.*, at 1). The letter informed plaintiff that a certified wetland determination had previously been completed on the area—that is, the nine acres which were determined to be wetlands in 2010. The letter notified plaintiff that the time period to request an appeal had expired. (*Id.*). The letter further noted, however, that plaintiff could request review of NRCS's decision to deny plaintiff appeal rights and who to contact to request such a review. (*Id.*, at 1–2). The letter also explained that plaintiff could request review of the wetland determination and provided the process for review. (*Id.*, at 1). A request for review must be in writing, the letter stated. (*Id.*). Plaintiff never requested further review after receiving this letter.

Conlan controls companies which own over 1,000 acres of Iowa farmland. (Doc. 67-1, at 6). Conlan's companies, including plaintiff, lease the property to tenants who farm the land. (*Id.*). Plaintiff, and plaintiff's tenant, participate in a number of USDA

---

[2] Conlan had already submitted a form AD-1026 on behalf of plaintiff about a month before he sent the email stating that he did not need a further wetland determination.

benefits programs. (*Id.*). Plaintiff's tenant on the property at issue in this lawsuit, Cory Pfab, also operates 18 other farms totaling over 2,000 acres of farmland. (*Id.*, at 8).

Plaintiff claims the nine acres which have been determined to be wetland are indistinguishable from the rest of the forested land which have been determined to be non-wetlands. (Doc. 57-2, at 5). Plaintiff also claims that the nine acres of determined wetland "do not contain any standing water, are not visibly wet, are not connected to any water body, and are not permanently or seasonally saturated or inundated by water at any time of the year." (*Id.*). Defendants deny or qualify each of these two claims, stating that in the 2010 wetland determination "NRCS determined that the wetlands area has a predominance of hydric soils, is inundated or saturated by enough surface or groundwater to support prevalent hydrophytic vegetation that would not be supported under normal circumstances." (Doc. 67-1, at 9–10). The parties agree, though, that there is a stream running through the property, but it runs through a portion of the non-wetlands, and not through any portion of the wetlands. (*Id.*, at 10). The parties also agree that the soil rating of the nine acres of wetlands is indistinguishable from the rest of the property. (*Id.*).

On April 16, 2024, plaintiff filed its complaint. (Doc. 1).

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish

7

the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). More specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of material fact is genuine if it has a real basis in the record." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992). It is also genuine "when a reasonable jury could return a verdict for the nonmoving party on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (citing *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex Corp.*, 477 U.S. at 323). The plaintiff may not then simply point to allegations made in its complaint, but must identify and provide evidence of "specific facts creating a triable controversy." *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999) (internal quotation marks omitted). When considering a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

8

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88. *See also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather, a "court's function is to determine whether a dispute about a material fact is genuine[.]" *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

## IV. ANALYSIS

As noted above, there are three motions for summary judgment before the Court. Intervenors filed a motion for summary judgment (Doc. 54), defendants filed a motion for summary judgment (Doc. 56), and plaintiff filed a motion for summary judgment (Doc. 57). The Court will consider defendants' and intervenors' motions first.

### A. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on several grounds. (Doc. 56). First, defendants argue plaintiff does not have standing to bring its claims. (*Id.*, at 2). Baked into defendants' standing argument is an argument that there is no final agency action for this Court to review because plaintiff has not requested relief at the agency level. (*Id.*). Defendants further argue, regarding standing, that plaintiff may not bring a Takings Clause claim in this Court due to the Tucker Act. (*Id.*, at 3). On the merits, defendants argue the Swampbuster statute is constitutional as a valid exercise of Congress's Spending Clause authority. (*Id.*). Defendants also argue that Swampbuster does not constitute a "taking" because compliance with the statute is simply a condition on eligibility for voluntary programs. (*Id.*). Defendants argue the USDA rules plaintiff challenges in this suit are supported by the best interpretation of the statute. (*Id.*, at 3–4). Finally,

defendants argue that any "as applied" challenge should be dismissed—that is, defendants assert that any challenge plaintiff makes to the wetland determination of its property fails for lack of evidence. (*Id.*, at 4).

Plaintiff resists on all fronts. (Doc. 65). First, plaintiff argues that it has standing based on several claimed injuries or imminent injuries. (*Id.*, at 8–11). Plaintiff's claimed injuries generally center around the theory that plaintiff has lost, or will lose, economic benefit of the nine acres of wetlands due to the effect of Swampbuster and/or USDA/NRCS's review provisions and process. (*Id.*). Plaintiff argues there is final agency action for the Court to review because, according to plaintiff, it requested review of the 2010 wetland determination, and NRCS denied the request without granting plaintiff any appeal rights. (*Id.*, at 11–14). On the merits, plaintiff argues Swampbuster creates an unconstitutional condition on benefits. (*Id.*, at 16–20). The constitutional rights plaintiff claims Swampbuster infringes upon come from the Commerce Clause and Takings Clause. (*Id.*). Plaintiff further argues Swampbuster is not a constitutional exercise of Congress's spending power. (*Id.*, at 20–22). Finally, plaintiff argues the regulations—both the review provision and the converted wetlands rule—contradict the plain text of the statutes they implement. (*Id.*, at 22–27).

## B.    *Intervenors' Motion for Summary Judgment*

Intervenors also filed a motion for summary judgment. (Doc. 54). Intervenors argue for summary judgment on several grounds: plaintiff lacks standing; the Court lacks subject matter jurisdiction over all of plaintiff's claims for lack of cause of action and failure to exhaust administrative remedies; and intervenors make similar arguments to defendants on the merits. (*Id.*, at 2; Doc. 54-1). Plaintiff responds to some, but not all, of intervenors' arguments. (*See* Doc. 65). Plaintiff specifically responds to intervenors' argument regarding causes of action, arguing that the Administrative Procedure Act ("APA") provides a cause of action for all of plaintiff's claims. (*Id.*, at 14–15).

The Court will analyze the issues below, addressing both defendants' and intervenors' motions for summary judgment in each section.

### 1. Standing

Plaintiff lacks a cause of action to bring all of its claims. Plaintiff cites to a number of statutes in its complaint underlying its claims, including the Declaratory Judgment Act, the APA, and Title 42, United States Code, Section 1983. (Doc. 1, at 4, 21–26). When challenged by defendants and intervenors, plaintiff pins its argument exclusively on the APA. (Doc. 65, at 14–15). This makes sense.

Section 1983 only applies to state officials acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."). This is not applicable here. Further, the Declaratory Judgment Act "does not provide a separate basis for subject matter jurisdiction." *First Fed. Sav. & Loan Ass'n v. Anderson*, 681 F.2d 528, 533 (8th Cir. 1982).

Plaintiff instead argues that the APA—specifically, Title 5, United States Code, Section 702—provides a cause of action for all of its claims. (Doc. 65, at 14–15). Section 702 provides, in part, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." The Supreme Court has stated that:

> This provision contains two separate requirements. First, the person claiming a right to sue must identify some "agency action" that affects him in the specified fashion; it is judicial review "thereof" to which he is entitled. The meaning of "agency action" for purposes of § 702 is set forth in 5 U.S.C. § 551(13), *see* 5 U.S.C. § 701(b)(2) ("For the purpose of this chapter . . . 'agency action' ha[s] the meanin[g] given . . . by section 551 of this title"), which defines the term as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13). When, as here, review is sought not

pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the "agency action" in question must be "final agency action." *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and *final* agency action for which there is no other adequate remedy in a court are subject to judicial review" (emphasis added).

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990).

Here, plaintiff brings its action under the general review provisions of the APA, and therefore the "agency action" in question must be "final agency action." *Id.* Plaintiff contends defendants' letter notifying plaintiff how to request review of the 2010 wetlands determination was a final agency action. (Doc. 65, at 11–12). It is not. Plaintiff did not ask defendants to review the previous determination that the nine acres were wetlands. In fact, plaintiff had signaled that it would cut the trees down in the wetlands area but leave the stumps. In this, plaintiff showed its compliance with Swampbuster and with defendants' prior determination, not a desire to challenge the prior determination.[3] Plaintiff argues that it requested review of the 2010 determination by submitting the form AD-1026. Nothing in the filled out form AD-1026 backs this argument up. So, plaintiff's emails signal that plaintiff was not requesting review of the 2010 wetlands determination, and the form AD-1026 says nothing about reviewing the 2010 wetlands determination. If plaintiff's intention was to request a review of the 2010 wetlands determination, nobody else in the world could possibly have known it. Most importantly, plaintiff did not request review of the 2010 wetlands determination in any communication to defendants.[4]

---

[3] All parties agree that, under the relevant rule (which plaintiff is challenging in this lawsuit), cutting down trees in a wetlands area does not necessarily constitute a violation, but removing the stumps of said trees does generally lead to a wetland violation.

[4] The closest plaintiff got to requesting review was Conlan's email in July 2022 asking for "help with the process of seeking a determination (a redetermination) that some or all of the nine acres are not wetlands." (Doc. 56-2, at 58–59). But after reviewing the remainder of Conlan's

Defendants, therefore, did not deny plaintiff's request for review, as there was no request for review. The letter is not final agency action.

To the extent plaintiff argues that defendants failed to act, as included in the definition of a final agency action, (Doc. 65, at 12), it fails for the same reason. Defendants did not "fail to act" because plaintiff did not request anything. Had plaintiff requested review of the 2010 wetlands determination, and defendants ignored plaintiff, this could potentially be a valid argument for plaintiff (assuming it exhausted its administrative appeals and the like). But that is not what happened here. Instead, plaintiff simply never requested review of the 2010 wetlands determination. Plaintiff's arguments are without merit.

At base, by bringing this action under the APA, plaintiff is asking the Court to "hold unlawful and set aside agency action, findings, and conclusions" if they meet a certain standard. 5 U.S.C. § 706(2). The fundamental issue here is that the Court has no "agency action, findings, and conclusions" to review. There may have been a final agency action in 2010, when defendants concluded that nine acres of the relevant property were wetlands (ignoring potential exhaustion of administrative remedies and issue-specific exhaustion issues). But plaintiff is not challenging the 2010 determination. Plaintiff is challenging events which occurred in 2023. But defendants made no "action, findings, [or] conclusions" in 2023 which adversely affected plaintiff. Thus, plaintiff cannot bring any of these claims under the APA.

Relatedly, plaintiff does not have constitutional standing at this stage to bring any of its claims. To have standing, plaintiff must show it suffered an injury in fact, there must be a causal connection between plaintiff's injury and the conduct complained of, and it must be likely, not merely speculative, that plaintiff's injury will be redressed by

---

correspondence with USDA/NRCS representatives, it is clear that Conlan was no longer asking for review of the 2010 determination by the time he submitted the form AD-1026 months later.

a favorable decision. *Sanzone v. Mercy Health*, 954 F.3d 1031, 1046 (8th Cir. 2020). "An injury in fact must be '(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

Plaintiff's case fails on the first element of standing, and plaintiff's issue here is tied to its issue in bringing its claims under the APA. As defendants argue, plaintiff's alleged injury is not actual or imminent, but instead a "speculative chain of possibilities." (Doc. 59, at 7–11) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013)). Indeed, as defendants point out, if plaintiff is correct in its allegation that the nine acres are not, in fact, wetlands, then plaintiff should have no problems. That is, if plaintiff were to request a redetermination of the area currently determined to be wetlands, and plaintiff is correct that this land does not meet the definition of wetlands, then defendants will (or at least should) overturn the previous decision, and plaintiff will have no injury. Additionally, for plaintiff to lose benefits—plaintiff's claimed imminent injury here— several other factors (on top of a determination that the nine acres are indeed wetlands) would have to be determined at the agency level against plaintiff. Two examples are particularly notable here. Plaintiff's actions would have to have more than "a minimal effect on the wetland functions and values of wetlands in the area[.]" 7 C.F.R. § 12.5(b)(1)(v). Plaintiff would also have the opportunity to mitigate the wetlands loss, if it converted its wetlands, which would allow plaintiff to keep its benefits. 7 C.F.R. § 12.5(b)(4). The Supreme Court has noted that it has "been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413. Plaintiff's standing theory here requires guesswork as to how independent decisionmakers—NRCS and USDA—will exercise their judgment. This guesswork is the kind of "speculative chain of possibilities" that cannot support injury in fact.

The Court therefore **grants** defendants' and intervenors' motions for summary judgment on these issues.

The Court will analyze several of the issues on the merits, however, and will ultimately alternatively grant defendants' and intervenors' motions on those grounds as well.

### 2.    *Constitutionality of Swampbuster*

Plaintiff's first claim in its complaint is that Swampbuster violates the Commerce Clause. (Doc. 1, at 21–22). Defendants argue Swampbuster is not an exercise of Congress's Commerce Clause authority, but instead an exercise of Congress's authority under its spending power. (Doc. 59, at 12–16). Plaintiff responds by arguing generally that Swampbuster is an unconstitutional use of the spending power. (Doc. 65, at 20–22).

The Swampbuster Act was well summarized as follows by a court recently:

> The Swampbuster Act, 16 U.S.C. §§ 3801, 3821–3824, refers to the wetland conservation provisions of the Food Security Act of 1985. *See Barthel v. U.S. Dep't of Agric.*, 181 F.3d 934, 936 (8th Cir. 1999). The purpose of the Swampbuster Act is "to combat the disappearance of wetlands through their conversion into crop lands." *B & D Land & Livestock Co. v. Schafer*, 584 F. Supp. 2d 1182, 1190 (N.D. Iowa 2008) (citation omitted); *see also Barthel*, 181 F.3d at 937 ("The [Swampbuster] Act's proclaimed purpose is to preserve wetlands, or, if wetlands are altered, to preserve the conditions as altered."). As an enforcement mechanism, the Swampbuster Act sets forth that persons who convert certified wetlands to crop lands are disqualified from receiving federal farm benefits. 16 U.S.C. § 3821; *Schafer*, 584 F. Supp. 2d at 1190.
>
> 16 U.S.C. § 3822(a)(4) concerns the "Duration of Certification" and states that once an area is certified as a "wetland" under the Swampbuster Act, that certification remains valid and enforceable "as long as the area is devoted to an agricultural use or until such time as the person affected by the certification requests review of the certification by the Secretary." 16 U.S.C. § 3822(a)(4). In 1996, the Code of Federal Regulations imposed criteria on when a party could request review of a wetland certification, stating that a "wetland" certification "will remain valid and in effect until

such time as the person affected by the certification requests review of the certification by NRCS. *A person may request review of a certification only if a natural event alters the topography or hydrology of the subject land to the extent that the final certification is no longer a reliable indication of site conditions, or if NRCS concurs with an affected person that an error exists in the current wetland determination.*" 7 C.F.R. § 12.30(c)(6) (emphasis added). Therefore, pursuant to 7 C.F.R. § 12.30(c)(6), a wetland certification is binding and enforceable if and until a person affected by the certification requests review of that certification and natural changes to the wetland make the certification unreliable, or until such a person requests review and NRCS agrees that the wetland certification is erroneous.

*Foster v. U.S. Dep't of Agric.*, 609 F. Supp. 3d 769, 775–76 (D.S.D. 2022), *aff'd*, 68 F.4th 372 (8th Cir. 2023), *cert. granted, judgment vacated*, 144 S. Ct. 2707 (2024).

Swampbuster, at base, is a condition upon federal farm benefits. If somebody has a certified wetland on their property, and they convert said wetland into crop land, they will be disqualified from receiving federal farm benefits. There are numerous exceptions and further definitions applicable, but for this issue, this understanding is all that is needed.

In resisting summary judgment, plaintiff essentially gives up on its argument under this issue. To be clear, plaintiff still claims that the Commerce Clause does not justify Swampbuster. But plaintiff's real argument here is that Swampbuster is an invalid exercise of Congress's spending power. This argument is in response to defendants' argument that, essentially, the Commerce Clause is irrelevant for this issue, because Swampbuster comes under Congress's spending power.

The issue is whether Swampbuster is an unconstitutional exercise of Congress's authority under the Commerce Clause. The problem with this framing of the issue, however, is that it misses the point. The Food Security Act, of which Swampbuster is a part, is an exercise of Congress's spending power. Under Article I, Section 8, clause 1 of the Constitution, Congress "shall have Power To lay and collect Taxes, Duties,

16

Imposts and Excises, *to pay the Debts and provide for the* common Defence and *general Welfare of the United States*[.]" (emphasis added). The Supreme Court has held that "[i]ncident to this power, Congress may attach conditions on the receipt of federal funds," and the Court has noted that Congress "has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (internal quotations omitted). The *Dole* Court further explained that "objectives not thought to be within Article I's enumerated legislative fields may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." *Id.* at 207 (cleaned up). Swampbuster fits squarely into this category.

Swampbuster is an exercise of Congress's spending power. As noted above, Swampbuster is a condition on federal benefits. Congress has chosen to provide certain benefits to farmers conditioned upon compliance with Swampbuster provisions. This is what the Court called a "conditional grant of federal funds" in *Dole*. *Id.* And as explained in *Dole*, Congress can accomplish objectives not within its Article I "enumerated legislative fields" through its spending power and conditional grants of federal funds. *Id.* Thus, Swampbuster does not need to pass muster under the Commerce Clause—if it fits under the spending power, there is no need for Swampbuster to also pass muster under an Article I enumerated legislative field. Other courts are in accord. *See Foster*, 609 F. Supp. 3d at 781; *United States v. Dierckman*, 201 F.3d 915, 922 (7th Cir. 2000); *Horn Farms, Inc. v. Johanns*, 397 F.3d 472, 477 (7th Cir. 2005) (analyzing Swampbuster under the spending power without discussion of any other rationale). Whether Swampbuster "violates the Commerce Clause" is therefore immaterial.

Thus, defendants' and intervenors' motions for summary judgment as to plaintiff's Claim I, Violation of Commerce Clause, are alternatively **granted** on the merits.

17

### 3. *Unconstitutional Conditions*

Plaintiff's second claim in its complaint is a claim under the unconstitutional conditions doctrine relating to the Commerce Clause. (Doc. 1, at 22–23). Plaintiff's third claim in its complaint is a claim under the unconstitutional conditions doctrine relating to the Takings Clause. (*Id.*, at 24–26).

As the Court found above, Swampbuster is an exercise of Congress's spending power. This allows Congress to "attach conditions on the receipt of federal funds" in order to attain objectives not "within Article I's 'enumerated legislative fields[.]'" *Dole*, 483 U.S. at 206–07 (quoting *United States v. Butler*, 297 U.S. 1, 65 (1936)). In short, Congress can spend in pursuit of the general welfare, and may require a recipient's compliance with conditions to receive the funding. Accordingly, the Supreme Court has "repeatedly characterized Spending Clause legislation as much in the nature of a contract." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576–77 (2012) (cleaned up).

The spending power, however, is not unlimited, "but is instead subject to several general restrictions articulated in [Supreme Court] cases." *Dole*, 483 U.S. at 207. First, "the exercise of the spending power must be in pursuit of 'the general welfare.'" *Id.* A second restriction requires Congress, when conditioning the States' receipt of federal funds, to do so unambiguously. *Id.* Third, "conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'" *Id.* (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978) (plurality opinion)). Plaintiff does not make any argument under these first three restrictions.

Plaintiff makes arguments here related to the fourth and fifth spending power limiting factors. According to the Eighth Circuit Court of Appeals, the fourth limitation

on Congress's spending is that "conditions must not be prohibited by other constitutional provisions[.]" *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009).

Specifically, plaintiff makes arguments under the unconstitutional conditions doctrine. This doctrine is expressed in a variety of contexts, but the general principle is that "the government may not deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). In *Dole*, the Court analyzed the issue as whether there was an "independent constitutional bar" limiting the spending at issue. 483 U.S. at 209. The Supreme Court has especially applied this doctrine in the context of limitations on freedom of speech, noting that "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). This, the Court explains, "would allow the government to 'produce a result which (it) could not command directly.'" *Id.* (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).[5] The "overarching principle" of the unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz*, 570 U.S. at 604.

Plaintiff argues that, because Congress could not regulate the wetlands directly under the Commerce Clause, "it cannot produce the same regulatory effect by offering a benefit to farmers to 'voluntarily' comply with the regulation." (Doc. 65, at 16–17). But the Supreme Court has explained that "the constitutional limitations on Congress

---

[5] The Supreme Court has also decided a series of cases applying a "special application" of the unconstitutional conditions doctrine "that protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits." *Koontz*, 570 U.S. at 604. Both plaintiff and defendants argue that this "special application" is not applicable in the context of this case. (Docs. 59, at 18–19; 65, at 19–20). The Court therefore need not discuss the standards under the special application explained in *Koontz*.

when exercising its spending power are less exacting than those on its authority to regulate directly." *Dole*, 483 U.S. at 209. The *Dole* Court rejected the petitioner's argument in that case that "Congress may not use the spending power to regulate that which it is prohibited from regulating directly under the Twenty-first Amendment." *Id.* The Court held instead that this limitation is not "a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly." *Id.* at 210. Thus, the Supreme Court has rejected plaintiff's approach here.

In sum, plaintiff's argument is that because Congress could not regulate intrastate wetlands directly under the Commerce Clause, Congress cannot attempt to effectuate the regulation through conditional spending. But, in *Dole*, the Supreme Court specifically rejected this type of argument, holding instead that Congress's spending power is not as narrow as its other enumerated powers, and Congress can therefore condition spending in areas that it could not regulate directly. Congress did just that in Swampbuster. Thus, plaintiff's argument that Swampbuster effectuates an unconstitutional condition in requiring farmers to give up their interests protected by the Commerce Clause fails.[6]

Plaintiff also argues Swampbuster creates an unconstitutional condition by requiring farmers to give up their rights under the Takings Clause. (Doc. 65, at 17–20). Plaintiff's argument here is that "Swampbuster, in effect, requires farmers to transfer a conservation easement to the government that limits farmers' use of wetlands." (*Id.*, at 18). Plaintiff reasons that defendants have effectuated a taking because defendants have, in effect, compelled plaintiff to grant an easement of sorts on the wetland area. Thus,

---

[6] The analysis under the Commerce Clause here has been significantly confused by the fact that plaintiff has not identified any specific constitutional right which it must give up in order to receive benefits. The Supreme Court's cases involving the unconstitutional conditions doctrine as applied to individuals largely involve a clear constitutional right. *See, e.g.*, *Perry*, 408 U.S. at 593 (freedom of speech); *Koontz*, 570 U.S. at 604–09 (Fifth Amendment right to just compensation). Plaintiff has pointed to no such concrete constitutional individual right under its Commerce Clause claim.

plaintiff concludes, Swampbuster unconstitutionally conditions USDA benefits upon plaintiff giving up its rights under the Takings Clause.

Defendants argue that plaintiff fundamentally misunderstands Swampbuster. Specifically, defendants argue that plaintiff's claim here "fails on its most basic premise: Swampbuster does not independently take anything from, or require anything of, the landowner." (Doc. 59, at 16). Defendants argue that the government has no right to enforce any property right on the farmers' land under Swampbuster, meaning plaintiff's comparison to an easement is off base.

Defendants have the better argument here. First, plaintiff is voluntarily accepting the government's offer by accepting USDA benefits. In return, plaintiff is agreeing to not destroy or alter its wetlands in a way that makes the cultivating of an agricultural commodity possible on that land. Even under this agreement, plaintiff can do many things with its land—including, for example, what it did here: logging. Further, plaintiff can use its land any way it wants at any time. The only consequence is a potential loss of certain USDA benefits.

Finally, plaintiff's argument here simply does not fit. Plaintiff's claim is that it is giving up a right in the form of compensation in return for a taking of its property by the government. This context is peculiar, because plaintiff's remedy under its Takings Clause argument would be compensation. But plaintiff is receiving compensation in the form of USDA benefits in return for not using its wetlands in a certain way. Further, the conditions Swampbuster places upon benefits likely do not amount to a taking.[7]

---

[7] The Court does not base its holding on this conclusion because the parties have not extensively briefed this issue. But the Court notes that, in the regulatory takings context, "where an owner possesses a full bundle of property rights, the destruction of one strand of the bundle is not a taking." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 327 (2002) (cleaned up). Also, Swampbuster was clearly enacted for a public purpose, and the parcel as a whole has very likely not been denied economically viable use by Swampbuster's provisions.

Ultimately, neither of plaintiff's unconstitutional conditions arguments hold weight.

The final limitation on Congress's spending is that "the circumstances must not be so coercive that 'pressure turns into compulsion.'" *Van Wyhe*, 581 F.3d at 650 (quoting *Dole*, 483 U.S. at 211). But the rationale for this final limitation is based upon "our system of federalism," making sure that Congress cannot "require the States to regulate." *Sebelius*, 567 U.S. at 577–78. As one court put it, if the "spending power may not be used in a way that coerces states to surrender fundamental attributes of their sovereignty," plaintiff has no argument under this limitation, because plaintiff "is not a governmental body and lacks any sovereignty that can be trampled upon." *Horn Farms, Inc.*, 397 F.3d at 476–77 (citing *Dole*, 483 U.S. at 212–18) (O'Connor, J., dissenting)).

Plaintiff cites *Bond v. United States*, 564 U.S. 211, 222 (2011) in response, arguing that the coercion limitation also applies to plaintiff because "[t]he limitations that federalism entails are not . . . a matter of rights belonging only to the States." (Doc. 65, at 21–22) (quoting *Bond*, 564 U.S. at 222). But *Bond* dealt with a non-sovereign's standing to make a constitutional challenge to a criminal statute under Tenth Amendment federalism principles. Here, the issue is instead whether the coercion limitation on Congress's spending power is even applicable to non-sovereigns. The Supreme Court's precedent shows that coercion as a limitation on Congress's spending power is based upon a fear of the federal government trampling over the States' sovereignty in areas where states have the power to regulate and the federal government does not. But plaintiff "is not a governmental body and lacks any sovereignty that can be trampled upon." *Horn Farms, Inc.*, 397 F.3d at 476–77. Thus, plaintiff's argument that Swampbuster is unduly coercive holds no weight.

---

These are two important factors in the regulatory takings analysis. *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485–501 (1987).

But even if plaintiff's coercion argument could get over the first hurdle, it could not cross the finish line. Plaintiff's argument is that Swampbuster is unduly coercive because a "person who is found to have violated Swampbuster is disqualified from several federally authorized agricultural benefit programs and could lose all their USDA benefits." (Doc. 65, at 21). "As a result," plaintiff reasons, "farmers are left with little alternative but to submit to Swampbuster's coercive regulatory scheme." (*Id.*). The premise here does not necessarily lead to the conclusion. Plaintiff has not developed this argument by, for example, showing the extent to which losing USDA benefits would injure plaintiff. Thus, even if coercion was a relevant factor in the analysis, plaintiff has failed to develop the necessary facts to show that Swampbuster is, in fact, "unduly coercive," as plaintiff puts it.

Additionally, even if the conditions were unduly coercive, they would need to be coercing plaintiff to give up a constitutional right for plaintiff's claim to have merit. The Court found above that Swampbuster does not require plaintiff to give up any constitutional rights in violation of the unconstitutional conditions doctrine. Thus, even if coercion mattered for individuals, and even if the conditions here were overly coercive, it would come to nothing, because Swampbuster is not attempting to coerce plaintiff to relinquish a constitutional right in return for benefits.

Finally, plaintiff points out that the Supreme Court has held that a somewhat similar program to Swampbuster exceeded Congress's authority under the Commerce Clause and spending power. *See Butler*, 297 U.S. at 62–73. The statutory scheme at issue in *Butler* involved a tax on processors of farm products, which were paid to farmers under contracts, who would agree to reduce their area of cultivation. The Court indeed struck the act down because it was "a statutory plan to regulate and control agricultural production, a matter beyond the powers delegated to the federal government." *Id.* at 68.

*Butler* does not tip the scales in favor of plaintiff. As one court put it, *Butler* "relied on an overly narrow view of Congress' enumerated powers to determine that Congress had overstepped its authority." *Kansas v. United States*, 214 F.3d 1196, 1200 n.6 (10th Cir. 2000). The *Kansas* court further noted that "[t]he analysis in *Butler* has been discredited as flawed and unworkable, and has not been followed." *Id*. *See also United States v. Lipscomb*, 299 F.3d 303, 319 (5th Cir. 2002) ("Although the *Butler* Court did hold that the Tenth Amendment cabined Congress's spending power, the Court quickly abandoned this view[.]") (footnote omitted). Even opinions which generally rely upon the rationale of *Butler* recognize that *Butler* is flawed. *See Dole*, 483 U.S. at 216–17 (O'Connor, J., dissenting). *Butler* does not change this Court's analysis above.

Thus, defendants' and intervenors' motions for summary judgment as to plaintiff's Claims II and III, unconstitutional conditions based upon the Commerce Clause and Takings Clause, are alternatively **granted** on the merits.

### 4. USDA Rule Defining "Converted Wetland"

Plaintiff's fourth claim in its complaint challenges USDA's rule defining "converted wetland" under Swampbuster. (Doc. 1, at 26–27). But plaintiff has not exhausted its administrative remedies. As intervenors note, (Doc. 54-1, at 19), a party must "exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against the Secretary; the Department; or an agency, office, officer, or employee of the Department." 7 U.S.C. § 6912(e). Plaintiff has failed to exhaust any administrative remedies, including even the first step. Plaintiff has not even asked for a redetermination of the wetlands in the first place, as the Court concluded above. Plaintiff has failed to exhaust administrative remedies, and therefore cannot bring this claim under the APA.

The Court would also, however, reject plaintiff's arguments on the merits. Under Title 16, United States Code, Section 3801(a)(7)(A), "converted wetland" is defined as

"wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including any activity that results in impairing or reducing the flow, circulation, or reach of water) for the purpose or to have the effect of making the production of an agricultural commodity possible if" certain other conditions apply. The USDA's rule includes a small addition when defining converted wetland: "Converted wetland is a wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including *the removal of woody vegetation or* any activity that results in impairing or reducing the flow and circulation of water) for the purpose of or to have the effect of making possible the production of an agricultural commodity" if the same other conditions apply. 7 C.F.R. § 12.2(a) (emphasis added).

Plaintiff argues the rule is contrary to the text of the statute. (Doc. 65, at 26–27). Plaintiff's argument is that "otherwise manipulated" in the statute includes activities that result in impairing or reducing the flow, circulation, or reach of water, and adding "the removal of woody vegetation" in the rule contravenes the statutory language. The idea is that the agency does not have the authority to make additions to the definition which do not result in impairing or reducing the flow, circulation, or reach of water. Plaintiff argues that, because the "removal of woody vegetation" appears to be separate from the "results in reducing the flow and circulation of water" language, the agency has exceeded its bounds.

Defendants argue the additional language in the rule simply adds an example that falls within the statutory language. (Doc. 59, at 24–26). The rule, according to defendants, "neither exceeds nor modifies the statute." (*Id.*, at 24). Instead, defendants argue, the rule simply clarifies the statute, and therefore the agency has not exceeded its authority. More specifically, defendants assert that the added language "does not alter the statutory definition, because 'the removal of woody vegetation' is an example of how

a wetland could be 'otherwise manipulated' for the purpose of, or to have the effect of, making an agricultural commodity possible." (*Id.*, at 25).

In *Ballanger v. Johanns*, 495 F.3d 866 (8th Cir. 2007), the court rejected a similar challenge to this same agency rule. The *Ballanger* court noted that the parenthetical language in the statute, "including any activity that results in impairing or reducing the flow, circulation, or reach of water," 16 U.S.C. § 3801(a)(7)(A), "is merely illustrative of the type of activity that might qualify as manipulation of wetland." *Ballanger*, 495 F.3d at 871. The court reasoned that "[b]y using the term 'including' it seems that Congress did not intend to impose a separate or additional requirement that the agency prove an impairment or reduction in 'the flow, circulation, or reach of water,' before making a finding that land qualifies as a 'converted wetland.'" *Id.* (internal citation omitted).

Read this way, the parenthetical language in the statute is simply an example of what manipulation of a wetland could include. The agency added another example in the parenthetical ("removal of woody vegetation") of what manipulation of a wetland could include. The Court sees nothing wrong with this addition, especially considering "otherwise manipulated" is very broad language which would potentially include many activities.

Plaintiff rightly notes that the standard for deciding this issue is different now than it was when *Ballanger* was decided. (Doc. 65, at 27). *Ballanger*'s ultimate holding was based on deference to the agency's interpretation under the *Chevron* doctrine. *See Ballanger*, 495 F.3d at 872 ("We must defer to the agency's interpretation of the statute it is charged with enforcing unless that interpretation is contrary to the statute's unambiguous meaning."). The Supreme Court overturned the *Chevron* doctrine in the interim in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). Automatic binding deference to reasonable agency interpretations under ambiguous statutes is gone.

It is replaced by "the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions." *Id.* at 394. Courts must now analyze agency interpretation cases as they would any other, by using "every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* at 400. But the *Loper Bright* Court did not instruct courts to "decide such questions blindly." *Id.* at 402. Instead, courts should take into account the agency's perspective, which "may be especially informative to the extent it rests on factual premises within the agency's expertise." *Id.* (cleaned up). Courts must analyze the issue independently, but "with due respect for the views of the Executive Branch." *Id.* at 403. Finally, the *Loper Bright* opinion specifically noted that holdings which relied upon *Chevron* "are still subject to statutory stare decisis" despite the Court's "change in interpretive methodology." *Id.* at 412.

The Court agrees with defendants' argument here. First, in *Ballanger*, the Eighth Circuit rejected a challenge like plaintiff's here. 495 F.3d at 871–73. Although the methodology for reviewing this type of challenge has changed, the holding in *Ballanger* itself is still "subject to statutory stare decisis." *Loper Bright*, 603 U.S. at 412. Additionally, the court in *Ballanger* noted that by "using the term 'including' it seems that Congress did not intend to impose a separate or additional requirement that the agency prove an impairment or reduction in 'the flow, circulation, or reach of water,' 16 U.S.C. § 3801[(a)(7)(A)], before making a finding that land qualifies as a 'converted wetland.'" 495 F.3d at 871. Given this reasoning, "otherwise manipulated" can potentially include many activities in this context. Removing woody vegetation would seem to be one example of manipulating a wetland. Further, although the Court must not blindly defer to agency rules and rulings, it must give due respect to the views of the agency, which can be "especially informative to the extent it rests on factual premises within the agency's expertise." *Loper Bright*, 603 U.S. at 402 (cleaned up). The ways

in which farmers might commonly manipulate wetlands is at least factual-adjacent. And it is certainly more within the agency's expertise than this Court's expertise. Thus, the agency's decision to include this in the rule is entitled to at least some amount of respect. The Court thus finds that the agency rule does not contradict the plain text of the statute, as plaintiff argues here.

Thus, defendants' and intervenors' motions for summary judgment as to plaintiff's Claim IV, challenging the definition of "converted wetland" in 7 C.F.R. § 12.2(a), are alternatively **granted** on the merits.

### 5. *USDA Review Regulation*

Plaintiff's fifth claim in its complaint challenges the administrative rule regarding requests to review a prior wetland certification. (Doc. 1, at 27–29). But again, plaintiff failed to exhaust its administrative remedies. The analysis here is the same as the Court's analysis in the section above regarding exhausting administrative remedies. Additionally, the Court notes that, as it appears to the Court, plaintiff would also be required to raise this issue (and all of the others it wants to challenge) in the administrative proceeding before this Court could review the specific issue. *See Ballanger*, 495 F.3d at 869–71 ("Therefore, we conclude that issue exhaustion is required, and we need not address the arguments that Ballanger failed to specifically present to the agency."). For these two reasons, this Court need not address plaintiff's arguments here.

Thus, defendants' and intervenors' motions for summary judgment on plaintiff's Claim V, challenging the rule regarding requests to review a prior wetland certification, are both alternatively **granted** for these reasons.

### V. *PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

Plaintiff also filed a motion for summary judgment. (Doc. 57). Defendants and intervenors resisted, (Docs. 66 & 67), and plaintiff filed a reply (Doc. 71). The issues and arguments under plaintiff's motion are essentially the same as the issues and

28

arguments under defendants' and intervenors' motions. Of course, considering the Court granted summary judgment to defendants and intervenors when it was required to view the evidence in the light most favorable to plaintiff, the Court will deny plaintiff's motion, where it must view the evidence in the light most favorable to defendants and intervenors. The Court incorporates its legal analysis and conclusions in resolving defendants' and intervenors' motions here.

Thus, plaintiff's motion for summary judgment (Doc. 57) is **denied**.

## VI. *CONCLUSION*

For the reasons stated above, the Court **denies** plaintiff's motion for summary judgment, (Doc. 57), **grants** intervenors' motion for summary judgment, (Doc. 54), and **grants** defendants' motion for summary judgment (Doc. 56). Plaintiff's claims are all **dismissed with prejudice** and this case can be closed.

**IT IS SO ORDERED** this 29th day of May, 2025.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa